ASA T. LAWTON *vs.* THE SUN MUTUAL INSURANCE COMPANY.

Acts and conduct of master or mariners, to constitute barratry, must be wilful, that is, not accidental, or caused by negligence, unless the negligence be so great as to amount to evidence of fraud; they must be acts of known illegality, or of gross malversation in office, or of criminal negligence; and they must be done for some unlawful or fraudulent purpose, *contrary to the duty of the master and mariners* to the owners of the vessel; but it is not necessary that such acts or conduct should be fraudulent, in the sense of an intention on the part of master and mariners, to promote thereby their own benefit at the expense of the owners ; and, in general, it is immaterial what may be the particular motive for such acts or conduct, provided the effect be injurious to the owners of the vessel.

If the master of a whaling vessel fraudulently or unlawfully sell or dispose of any part of the ship's tackle, apparel or furniture, or of her outfits or supplies, in order to obtain money for his own use, or fraudulently convert to his own use money furnished by the owners for the purchase of refreshments or supplies, such acts and conduct amount to embezzlement, and, so far as they interrupt or defeat the purposes of the voyage, constitute barratry.

Acts of barratry are not justified or excused by *being done in a state of intoxication,* caused by the voluntary and excessive use of ardent spirits; otherwise, if such acts are done in a state of actual insanity, caused by a long course of intemperance, or by a sudden interruption of a habit of excessive drinking.

A policy of insurance by which, amongst other perils, the underwriters insure against barratry of the master or mariners, on a ship, tackle, apparel, outfits and takings on a whaling voyage described in the policy, does not extend to and cover damages arising from the delay of the vessel, and the retardation and ultimate loss of the voyage, occasioned by acts of barratry on the part of the master.

The master of a whaling vessel, instead of cruising for whales, went into the port of Tahiti, and there committed acts of barratry, by selling portions of the ship's tackle, apparel, furniture, supplies and outfits, in consequence of which, and of the desertion of the crew occasioned by it, the vessel became disabled from pursuing her voyage, and, by neglect and exposure, suffered damage in her hull, sails, rigging, &c., and was taken possession of by the U. S. consul at Tahiti, and sent home to her owners, to prevent a total loss; it was held, that, in estimating the amount for which insurers were liable, on a policy insuring the vessel against barratry of the master and mariners, all the above enumerated losses were to be included.

THIS was an action of assumpsit, on a policy of insurance dated the 5th of October, 1843, underwritten by the defendants on the ship Timoleon, her tackel, apparel, outfits and takings, on a whaling voyage described in the policy, for the sum of $4500. The vessel was valued at $10,000, and the outfits at $14,000. One of the perils insured against was the " barratry of the master and mariners."

The ship sailed from New Bedford, on the 10th of November, 1843, and having touched at various ports and places,

arrived at Tahiti, one of the Society Islands, on the 13th of May, 1844, where she remained forty-two days, during which time the greater part of the crew deserted. Others were shipped in their stead, and, on the 27th of June, the vessel sailed from Tahiti on a cruise for whales, and returned to the same port on the 27th of November, 1844, where she was taken possession of by the consul of the United States, and sent home under the charge of midshipman Brown, of the United States navy, who navigated her to the port of New Bedford, and delivered her into the possession of the plaintiff, on the 12th of July, 1845.

The plaintiff claimed to recover as for a total loss of the outfits and voyage, by reason of the barratry of the master, William Plaskett; and the case having been opened to the jury, and sundry documents and depositions read, it was, by the consent of the parties, withdrawn from the jury, and submitted to the whole court upon the evidence introduced, namely : the plaintiff's specification of his demand; the letter of George R. Chapman, United States consul at Tahiti, dated February 14th, 1845; the certificate of F. Johnston, and H. Cary, surgeon and assistant surgeon in the British navy, addressed to the consul of the United States, at Tahiti; and the several depositions or affidavits of William H. De Lacy, and of William Miller, chief mate, and Charles Rule and Warren Baker, boat steerers, of the Timoleon.

If, in the opinion of the whole court, the acts and conduct of the master, as disclosed by all the evidence submitted on the part of the plaintiff, constitute the offence of barratry, against which the defendants insured, then judgment is to be entered for the plaintiff, and the damages to be assessed by an assessor, upon such principles as the court shall direct, otherwise the plaintiff is to become nonsuit.

It will be sufficient, in order to render the case intelligible, to state some of the material parts of the testimony, upon which it was submitted to the court.

In regard to the conduct of the master, on the voyage from New Bedford to Tahiti, Miller, the chief mate, testified as follows : —

" We took the general route of ships bound to the Indian Ocean, except that we kept in a lower latitude than ships generally do ; and the consequence was, that it lengthened our passage, on account of the light winds. No attempts were made to get into a higher latitude. I mentioned it several times to captain Plaskett, but he paid no attention to it. I asked the captain why he did not go farther south, and get stronger winds. He said, in answer, that he knew his own business best ; so I said no more. In my opinion, the best way to have made the outward voyage would have been round Cape Horn. If we had gone that way, we should have saved the season on the north-west coast. The Navy, Israel, and other vessels, which sailed after us, saved the season. While we were on that passage, the captain was all the time more or less intoxicated ; some days more and some days less. He was so bad at times that he was not capable of navigating the ship. In consequence of the long passage, and detention round the land, we lost the season on the north-west coast. At the Cape de Verd Islands, we lay off and on nine days ; at the Society Islands, ten days ; and we lay at Tahiti forty-three days."

Rule, one of the boat steerers, testified, that while lying off and on at the Cape de Verds, the captain nearly lost his speech, for a time ; and that while the vessel was on her outward passage, he was frequently incapable of doing any duty, or taking any care of the ship, from intoxication.

Baker, another of the witnesses, testified as follows : " Whenever we made land, the captain stopped the ship, and went on shore, detaining her a number of days — fourteen days trying to get into the harbor of Tristan d' Acunha, — three days lying off and on at St. Paul's, — and at the Cape de Verd Islands, we were seven or eight days, and then he began drinking to excess, and continued it until after we left Tahiti the first time. During this passage out, he continued to drink so hard, that, many times, he didn't seem to know what he was about. I first perceived the captain to be intoxicated the third day out. He became worse afterwards."

The consul, Mr. Chapman, in his letter, thus describes the arrival of the Timoleon at Tahiti, and the conduct and proceedings of the captain, whilst there the first time : —

" The Timoleon first arrived here from New Bedford, in May, 1844. She had been lying but a few days, when complaints were made at this office of brutal treatment on the part of the captain, who was represented to be constantly in a state of intoxication, totally unfit for the business necessary for expediting the departure of his ship, and, whenever upon deck, or able to leave his cabin, appearing in a state bordering on insanity, and, at all times, without the slightest provocation, abusing his officers and men with the most gross and obscene language.

" Among the greater number, such was principally the nature of the complaints made. He was accordingly summoned to appear at this office, where, upon investigation, the nature of the testimony elicited was such, that the demand for discharges, urged by officers and men, who feared not only for the safety of the ship, but for their personal security, was so far considered justifiable, that the sanction of the consul was obtained in consequence, where the mutual dissatisfaction was so great, and such fears entertained, as represented.

" With the passengers who came out, differences had also arisen, in consequence of his habitual intoxication ; and having made threats against the life of Dr. Winslow, it became necessary to confine him. He was accordingly arrested, and during his confinement constantly exhibited evident signs of insanity, which might and would have been considered as the usual consequence of total abstinence, after so long and such beastly dissipation, had not the whole tenor of his conversation and conduct, for the eight succeeding months, afforded additional evidence, that he had not only lost that energy and discretion necessary for the prosecution of a voyage, but, at frequent intervals, was perfectly imbecile.

" During his stay here, which was of at least three weeks' longer duration than was at all necessary, by discharge and desertion, he had lost nearly the whole of his original crew

' Beach combers,' and the detestable class of men that infest the ports of the Pacific, are the only ones to be found to replace absences, either by discharge or desertion, and with such a crew did the Timoleon leave here on her last cruise."

In regard to the conduct and deportment of captain Plaskett, during the forty-two days the vessel remained at Tahiti, the first time she was there, De Lacy testified : " His conduct at this time was very gross and violent, from the effects of intoxicating drink ; so much so, that he was brought to trial for violent conduct towards a passenger, Dr. Winslow, and was imprisoned in the calaboose. I saw him frequently intoxicated. When not intoxicated, he behaved like a gentleman ; when intoxicated, he was very wild."

Miller testified as follows : " While we were at Tahiti, the captain conducted about the same, as regards drink, as he did on board the ship. He was very bad all the time at Tahiti. At that time he sold all the tobacco, and some of the prints that were in the ship. All I know is, that after he sold the tobacco and prints, he was put in prison. I took the money from his trunk and sent it ashore. The next day, I told him what I had done, and he said it was eight hundred dollars. Nothing had been sold from the ship before. The ship was not in need of any thing there."

Rule testified, that, while at Tahiti, the captain drank very hard, and during most of the time was not capable of attending to any business or duty of the ship ; that many of the crew deserted, no exertions being made to keep them, or to regain them after their desertion ; that there was no necessity for the vessel's remaining at Tahiti, as she was in want of nothing ; and that there was no reason why they were detained there, except that it was the captain's will. The other witness testified, that whilst at Tahiti the first time the captain continued to drink excessively, and was on shore pretty much all the time.

After remaining at Tahiti forty-two days, the Timoleon sailed on the 27th of June, 1844, on a cruise, with a crew consisting of six or seven only of her original complement of

men, the rest having been discharged or deserted, and their places supplied by natives of the island, beach combers, English, Spanish, &c. This cruise is thus described by Baker in his testimony : " Captain Plaskett had drank so hard, that he had falling fits, a species of epilepsy, which almost entirely disqualified him from conducting the ship ; and his conduct was such, that the officers and crew became alarmed for the safety of the ship and their own lives. Upon one occasion, he ran so close into one of the Feejee Islands, that we were much in danger of being massacred by the natives. The captain kept hovering in to the island, which kept the crew and officers constantly in fear. On the 20th of October, the captain was aloft, and had one of his fits, and fell from the foretopmast cross trees overboard. We got him on board again, and stood in for the Navigator Islands. When he roused up, which he did in the course of two or three days, he directed us to tack ship, refusing to go in. The next day he directed us to stand for Tahiti, where we arrived on or about the 26th of November."

Miller testified, that the captain did not "seem inclined to do much whaling, from the appearance of things ; " that he, the witness, started the liquor, knocked it on the head, when they left Tahiti, so that they had none on board that cruise ; that the captain's health was very bad, and he had a number of fits, occasioned by drinking, as the witness supposed, because he had them on the passage out, after drinking. The captain fell from aloft, while on the cruise, and injured his knee and ankle.

Rule testified as follows : " We cruised two weeks off the islands, and then proceeded to the westward, touching at the islands. We got recruits of fresh provisions, fruit, &c., and the captain got some liquor. After we left Roratongo, the captain had rum fits, and ordered the ship to stand in for the Island Penni, and others of the Society Islands, so as to endanger the safety of the vessel and the lives of the crew. We continued to cruise for some time, without attempting to whale much, or paying any regard to a voyage."

On the arrival of the ship at Tahiti, the second time, the first mate, Miller, went on shore, with a boat's crew, to the United States consul, and informed him of the conduct of the captain, and that he was in such a deranged state of mind, from excessive drinking, that he (the mate) wished to have the vessel brought into port.  The consul thereupon went on board the ship, with a surgeon, and found the captain lying in his cabin perfectly helpless, yet obstinately refusing to permit the ship to enter the harbor.  The consul was informed, that, during the whole time since the vessel sailed from Tahiti, not one hour had been employed in cruising for whales, but, on the contrary, that the captain had been running the vessel from one island to another, endangering the lives of the crew, and exposing the ship to capture by his foolish temerity at savage islands; and that, in consequence of these things, the crew were not only unwilling to proceed farther with captain Plaskett, but were determined, if the consul left the ship without bringing her to anchor, to allow her to run on shore ; neither officers nor men considering themselves safe with one whom they believed to be a madman.  The ship was consequently brought in to an anchor, by the direction of the consul.  The men who shipped at Tahiti, for the cruise, having served the time specified, were discharged.  Many left without being discharged.  At the end of ten days there were only two remaining.

The witness, Baker, thus describes the conduct of the captain, and the condition of the ship, after she was carried into Tahiti, and brought to anchor the second time : " The ship lay at Tahiti, deserted by all her officers and ᴄrew, except myself and a boy, during much of the time.  The beach combers would come off with an order from the captain and live on board, and the ship was a rendezvous for many of this kind of persons, until the consul took charge of her.  Pretty soon after we came into Tahiti, the captain began to sell things from the ship, and continued selling until the consul took possession.  He sold boats, casks, oars, iron hoops, slops, tobacco, domestic goods, carpenters' tools, crockery, barometer,

spyglass. I have no means of forming an opinion of the value of what he sold. The captain continued drinking excessively, all the time we lay at Tahiti, and there had falling fits, and by his conduct the voyage was completely broken up."

De Lacy testified as follows: " The second time the ship came in, it was some weeks before I saw captain Plaskett. He was carried up in a weak, deplorable condition to Mrs. Shaw's, and there he remained. I saw him occasionally, in a weak and wild state. He appeared very strange. It was about two months before he got out. He got out four or five weeks, perhaps, before the ship left. I do not recollect as to the time. After he got out, he was sometimes pretty fair; at other times, he looked as if he had been drinking. He was walking about, taking but little concern in the ship's affairs. He did not go on board to my knowledge. I mean to say, that the captain was not competent to conduct the affairs of the ship, when he came in the second time, because he came ashore half a madman, with occasional fits, and from his being a drunkard. He did not continue in this deranged state of mind till I left. When he got collected, and when he did not drink, he was the man. Captain Plaskett did not take charge of the ship, when he got collected. He was not always in a sane mind ; all this was the effect of liquor."

The consul's statement, with regard to the condition of the vessel, and the conduct of the captain, after the second arrival at Tahiti, was as follows:

" The ship became a place of resort for scoundrels of all nations, and a refuge for deserters. Captain Plaskett sent every one on board who applied. Complaints were daily made by the police of disturbances of constant occurrence on board the Timoleon. The ship lay exposed to the rays of the tropical sun, burning her decks; her sides were becoming bad, her rigging was rotten, her sails were spoiled by mildew ; and two months' longer detention would have required $2000 repairs absolutely necessary to send her to sea. As it is now, during the time she has already been here, the injury

she has sustained by this exposure and neglect, is greater than would have occurred under ordinary circumstances, in the space of an eight months' cruise.  Remonstrance with captain Plaskett was of no avail.  He had, since his arrival, again commenced his course of dissipation, although confined to his room, and I seldom if ever found him really rational.  He has always admitted, that his health is so far gone, as to render it impossible for him to take charge of the ship again, yet would not consent voluntarily to resign his command, unless I would permit the sale of what oil, stores, &c. he wished, and the proceeds placed at his disposal."

The British surgeons, Johnston and Cary, who visited captain Plaskett, at the request of the consul, certified as follows: " We have, at different times, visited captain William Plaskett, and consider, that independent of the debilitated state in which we have found him, which, of itself, will prevent for many months the possibility of the exercise of the duties of a commander, we do not consider him at all times sane. We find that he is subject to fits of epilepsy, to an alarming extent; in one instance, having fifteen during a few hours. By any of these he is liable to be carried off.  We find that excitement deranges his intellect, and no excitement can exert a more delirious influence than that caused by the use of intoxicating drinks, in which, we are positive, he constantly indulges.  Nor do we consider that in his present state he is fit to take immediate passage for the United States."

The consul, under these circumstances, deemed it to be his duty to deprive captain Plaskett of his command, and to send the vessel home to her owners.

It appeared, from the consul's letter, that, for twenty years previous, captain Plaskett had been considered, " in point of energy and ability, for the prosecution of a whaling voyage, second to none sailing from the United States."  Miller testified, that he sailed with captain Plaskett the voyage before, a four years' voyage; during which he was not intoxicated either at sea or in port; that he was in the habit of taking his glass at eleven and four o'clock, and in the evening ; but

that he never drank enough to injure him in the management of the voyage. Rule testified, that Plaskett was always considered a skilful ship-master, and one who was well calculated to obtain a voyage. This witness never heard or knew of his intemperance, till he saw it on the voyage in question.

*T. G. Coffin,* for the plaintiff, referred to the following authorities, as to what acts of the master constitute barratry: *Lockyer* v. *Offley,* 1 T. R. 259; *Earle* v. *Rowcroft,* 8 East, 126, 134; *Knight* v. *Cambridge,* 1 Strange, 581; *Marcardier* v. *Chesapeake Ins. Co.* 8 Cranch, 39; *Swan* v. *Union Ins. Co.* 3 Wheat. 168; *Dederer* v. *Delaware Ins. Co.* 2 Wash. C. C. 61; *Patapsco Ins. Co.* v. *Coulter,* 3 Pet. 222, 228; *Vallejo* v. *Wheeler,* 1 Cowper, 143, 156; *Crousillat* v. *Ball,* 4 Dall. 294; *Cook* v. *Commercial Ins. Co.* 11 Johns. 40; *Stone* v. *National Ins. Co.* 19 Pick. 34; and contended that the acts of the master, as stated in the evidence, and his neglect of duty, commencing very soon after the vessel left New Bedford, and continuing until she was taken possession of by the consul, at Tahiti, were barratrous.

*J. H. Clifford,* for the defendants, after reviewing the evidence, argued that the acts of the master relied upon as barratrous, were manifestly those of an insane person; that a long course of indulgence in habits of intoxication, followed by a period of abstinence, had produced in him such a degree of mental imbecility as incapacitated him from knowing or discharging his duty, or of forming any criminal or fraudulent purpose, without which, his acts could not constitute barratry, within the meaning of the policy.

" By insanity the master ceased to be a voluntary or responsible agent." Shaw, C. J., in *Copeland* v. *N. E. Mar. Ins. Co.* 2 Met. 432, 448; *United States* v. *Drew,* 5 Mason, 28.

His entire conduct was that of a man whose mind had become deranged, and whose reason had been destroyed, by the vice in which he had so long indulged, and not that of a rational and responsible person, capable of forming, and actually forming, a deliberate intent to defraud.

In taking upon themselves the risk of barratry, the

43 *

underwriters did nothing more than to insure the plaintiffs against the commission of wilful fraud by the master, to the prejudice of their interests. Lord Ellenborough, in *Earle* v. *Rowcroft*, 8 East, 126, says, " Barratry is synonymous with fraud ; a fraudulent breach of duty by the master in respect to his owners with a criminal intent, or *ex maleficio*." In *Wiggins* v. *Amory*, 14 Mass. 1, 11, Parker, C. J., in an elaborate discussion of the subject, says, " there can be no barratry without fraud or crime." Chancellor Kent, 3 Com. 305, (4th ed.) states the distinction between the English and American law and that of France to be, that in the former barratry is used in the more limited sense of being applicable only to the wilful misconduct of the master or mariners. Lord Mansfield, in 1 T. R. 323, says, " Barratry must partake of something criminal." It cannot be maintained that even gross negligence of the master, by which loss is occasioned to the owners, amounts to barratry ; there must be fraud or criminality. *Phyn* v. *Royal Exchange Ass. Co.* 7 T. R. 505. And so is the whole current of authority. *Grim* v. *Phenix Ins. Co.* 13 Johns. 451 ; *Dederer* v. *Delaware Ins. Co.* 2 Wash. C. C. 61 ; *Todd* v. *Ritchie*, 1 Stark. R. 240 ; *Stone* v. *National Ins. Co.* 19 Pick. 34 ; 1 Phillips's Ins. 603 ; Hildyard on Ins. 184, and cases cited. The only case that seems to conflict with these, in giving a more extended definition to the term barratry, is that of *The Patapsco Ins. Co.* v. *Coulter*, 3 Pet. 222, 230, in which the opinion of the court, as pronounced by judge Johnson, was dissented from by two of the ablest judges of the court, justices Baldwin and Thompson. The result of the authorities establishes these conclusions ; that barratry necessarily implies the presence of mind and reason, of mind capable of forming a deliberate evil design, and of reason capable of acting with a fraudulent or criminal intent ; that no acts committed by a master when his mind was paralyzed or his reason alienated, whether such a state be produced by the visitation of God or by his own vices, can be deemed in law barratrous ; and that if there were no formed intention, but only a reckless and insane impulse

prompting to illegal conduct prejudicial to the interests of the owners, the illegality of his acts will not make his conduct barratrous or the underwriters liable.   The question is not, by what cause he was deprived of reason, but was he, when the acts alleged to be barratrous were committed, bereft of it from any cause ?   If so, he could not form a fraudulent or criminal intention, and therefore could not commit barratry.

In this case, the master, under the influence of insanity consequent upon long-continued intoxication, committed acts disastrous to the voyage and to the interests of the owners. This state of mind furnishes him with no immunity for the injuries he has done them ; but as between them and an innocent third party, who " had no voice in his appointment " to the trust he has abused, it is not enough that his conduct was illegal, indefensible, and prejudicial to their interests ; he must have had reason to conceive a fraud, and a formed criminal intent to consummate it, to throw upon the defendants the losses occasioned by his conduct.   See the close of chief justice Parker's opinion in *Wiggin* v. *Amory,* before cited.

SHAW, C. J.    This action is assumpsit on a policy of insurance, underwritten by the defendants for $4500, on the ship Timoleon and outfits, on a whaling voyage, commencing at New Bedford, October 3d, 1843, and to continue during the voyage and until her return to that port.   The amount insured was upon vessel and outfits, both valued, the ship at $10,000, and the outfits at $14,000.   Amongst the enumerated perils insured against, was barratry of the master and mariners.

The claim made by the plaintiff, and set forth in the declaration, is for a loss by the barratry of the master.

There has been much discussion among jurists as to the precise legal definition of barratry ; some difference seems to exist between the English law and the law as it prevails on the continent of Europe, on this subject ; and, perhaps, in some minute particulars, the English and American authorities do not entirely agree.   But we think they all agree substantially in holding, that barratry consists in wilful acts or

conduct of the master, or mariners, done for some unlawful or fraudulent purpose, contrary to their duty to the owners of the vessel. The act must be wilful, and not accidental, or caused by negligence, unless the negligence be so gross as to amount to evidence of fraud. *Patapsco Ins. Co* v. *Coulter*, 3 Pet. 222, 234. It has been held not to be necessary that there should be fraud, in the sense of an intention on the part of the master to promote his own benefit, at the expense of the owners ; but any wilful act of known criminality, or of gross malversation, operating to the prejudice of the owner, is in legal contemplation barratry. *Earle* v. *Rowcroft*, 8 East, 126 ; *Heyman* v. *Parish*, 2 Campb. 149. Every wilful act, on the part of the master, of known illegality, every gross malversation in his office, or criminal negligence, by whatever motive induced, whereby the owner is damnified, comes within the legal definition of barratry.

Some of the more prominent instances of barratry, which nearly resemble the present case, may be mentioned. Wilfu deviation by the master, in fraud of his owners, for purposes of his own, is barratry. *Vallejo* v. *Wheeler*, Cowp. 143. Dropping anchor and going ashore, to find a market for a private adventure, is barratry, which commences with the act of stopping on the voyage, for such purpose. *Ross* v. *Hunter*, 4 T. R. 33. Criminal delay of the voyage, for an unlawful purpose, is barratry. *Roscow* v. *Corson*, 8 Taunt. 684. A breach of trust by the master *ex maleficio* is held to be barratry. *Phyn* v. *Royal Ex. Ass. Co.* 7 T. R. 505, 509, note.

With these views of the law, we proceed to consider how far the case stated in the declaration is made out on the part of the plaintiff. When this action came on to be tried, and it appeared that the evidence was all in writing, consisting of correspondence, accounts and depositions, the case was taken from the jury, without a verdict, by consent of parties, and submitted to the whole court, upon the evidence, to decide the questions of fact as well as of law.

From the best consideration we have been able to give to the evidence, the court are of opinion, that many of the losses

proved are attributable to barratry of the master, which is covered by the policy, and for which the underwriters are responsible.

In the first place, we think it is proper to consider, whether the acts done by the master, independently of the state of mind under which they were done, would of themselves amount to barratry.

The evidence, we think, tends to prove, that captain Plaskett, before the commencement of this voyage, was a skilful, experienced, and energetic ship-master, in the whaling service ; that he had been in the habit of taking his grog daily, in moderation, but had not been, or been reputed to be, an intemperate man ; that very shortly after the vessel sailed, he began to drink excessively, so as to incapacitate him for the performance of his duties ; that he lingered off the Cape de Verd Islands eight or ten days, and a longer or shorter time at Tristan d'Acunha and other places, on his course to the Pacific, without any cause or purpose having any connection with the prosecution of his voyage ; that the voyage to Tahiti was greatly delayed ; that his going to Tahiti at all, instead of cruising for whales, was not occasioned by any exigency of the whaling voyage ; that his conduct at Tahiti, by which he lost most of his crew, was very reprehensible ; that his conduct during the cruise afterwards, in exposing his vessel to the attacks of savages, for no purpose which appears, other than that of going ashore to procure spiritous liquors, was wholly unjustifiable ; that his return to Tahiti after four or five months was without necessity ; and that his conduct there, in selling part of the tackle, apparel and supplies of the vessel, in suffering the vessel to lie without care and attention, her crew to desert, and the hull and rigging of the ship to go to decay, was without excuse.

If the question stood solely on the delay occurring on the outward voyage, there might be some doubt ; but if that delay were occasioned by the motive of procuring ardent spirits, which he was using to excess ; and more especially, if, as some of the witnesses testify, the vessel in consequence of

the delay lost a whaling season on the north-west coast; then it would appear, that the conduct of the master was unlawful; that his motive was to gratify his own unrestrained appetite; that it was destructive of all the proper objects of his voyage, contrary to his duty to the owners, and manifestly detrimental to their interests.

But whether such delay was barratry or not, we have no doubt, that his conduct at Tahiti, after his second arrival there, supposing it not to be justified or excused by circumstances, comes clearly within the denomination of barratry. The sale and disposal of boats, sails, oars, and other portions of the vessel and appurtenances, were fraudulent, *ex maleficio*, done to obtain money for his own use, and amounted to embezzlement. In many cases, embezzlement is put on the same footing with larceny; and in many cases, as well by the English law as our own, it is made larceny by statute. The difference is, that in embezzlement the property is intrusted by the owner, for a special purpose, with the party wrongfully converting it to his own use; in the other, it is taken in the first instance without the consent of the owner. A stronger case of embezzlement than the present can hardly be stated. The property was intrusted to the master for a special purpose, not to sell, but to enable him to prosecute the voyage which he had undertaken. Selling these articles, even for a fair price, and even with an intent to account for the proceeds to his owners, would have been an embezzlement; because, instead of promoting any of the purposes, it defeated the only purpose, for which they had been intrusted to him. The master's conduct, in this respect, comes within all the qualifications, which legally constitute acts of barratry.

Supposing the conduct of the master, from which these losses arose, to be *prima facie* barratry, is there any thing in the evidence, which can afford a justification or excuse? It seems to be established by the proof, that this conduct, on the part of the master, was the result of the excessive drinking of ardent spirits. It was intimated in the argument, that this very habit of intemperance was caused by a latent insanity,

which first manifested itself in that form. We suppose that there are cases, where a temperate person is affected with some latent disorder of mind, which leads him to excessive drinking; and where it becomes manifest, from subsequent indications, that the mental disease was the cause and not the consequence of intemperance. But this is matter of proof, of which this case appears to us to be deficient. Such a condition is not to be presumed without proof, because it is not within common experience; for where there is one case of this description, there are hundreds caused in the ordinary course of appetite indulged. From the proof, the case of captain Plaskett appears to be that of a man, who had habitually used ardent spirits, without excess apparent in his conduct, or manifest to others; but who, when taken from the influence of home and of friends, and from the society of equals, whose good opinion he regards, and placed in a situation where he is observed by no one, except those who are subordinate to him in rank and authority, and without sufficient moral principle to restrain him, indulges in the excessive use of stimulants, until the effect is to weaken his judgment, to cloud his reason, to awaken his passions, and thus to unfit him for the proper and faithful performance of duty.

Supposing, then, that these acts were the result of intoxication, caused in the ordinary way by voluntary and excessive indulgence in the use of ardent spirits, the court are of opinion, that the existence of such intoxication did not excuse or qualify his acts. They must be regarded as barratry, or not, according to their nature and intrinsic character, without regard to such state of intoxication. Conduct, which is unlawful in itself, does not cease to be unlawful, because it is done in a state of intoxication; and, in general, in the criminal law, intoxication does not excuse.

It was urged in the argument, that the underwriters do not insure against intoxication. It is true, that they do not insure against intoxication, as such, and if it lead to no loss. But if they insure against barratrous acts, and barratrous acts are

committed in a state of intoxication, the law holds the intox-
ication to be no excuse, and therefore the acts remain barra-
trous.  To this extent underwriters do insure against intoxica-
tion.  Were a bond given for the good behavior of a public or
private officer, — a trustee, cashier, agent, factor, clerk, or other
person intrusted with goods or money, — it would be no suf-
ficient excuse, we suppose, to allege and prove that acts done
by such officer, in violation of his duty, were done while he
was in a state of intoxication.

This leads to the consideration of the other point pre-
sented in this case.  It was suggested, that these acts might
have been done by the master, in a state of actual insan-
ity, caused, perhaps, by a long course of intemperance, or
by a sudden interruption of a habit of excessive drinking;
which circumstance would change the character of the acts
done, and would prevent them from being considered as
barratrous.  This distinction is no doubt well founded.  If
an intemperate man has fallen into a state of real and ac-
tual insanity; a state in which he is bereft of reason and
judgment, and the use of his moral powers and intellectual
faculties; although intoxication, frequent and repeated, was
the remote cause of that insanity, yet he is no longer a
responsible being; he is not amenable to the criminal law
for acts which would be otherwise criminal; and his acts
must be considered as pure accidents.  But this is to be
matter of proof, and not of mere assumption; and we have
looked into the evidence with that view.  It is always diffi-
cult, in such cases, to distinguish the acts of a drunken man
from those of an insane one; it is not sufficient to take the
phraseology of witnesses, especially those who are not pro-
fessional, and do not use language technically; but it is
necessary to look at the facts to which they testify.  The
consul, for instance, speaks of captain Plaskett, after his sec-
ond arrival at Tahiti, as a man who was represented to him
to be constantly in a state of intoxication, totally unfit, &c.,
appearing in a state *bordering upon insanity*.  So, in another
passage, he says, he (the master) "had again commenced his

course of dissipation, and I seldom, if ever, found him really rational."

The certificate of the surgeons, if more minute and explicit, would be more satisfactory. Their examination was made obviously with a view to ascertain captain Plaskett's capacity and condition. They say, " we do not consider him *at all times sane;* he is subject to epilepsy; excitement deranges his intellect, and no excitement can exert a more delirious influence than that caused by the use of intoxicating drinks, in which we are positive he constantly indulges."

This language, in our judgment, does not comport with the supposition, that these professional men intended to state their opinion, that the master was an insane person. They were of opinion, that he was not fit to take command of his vessel, and the facts they state fully corroborate that conclusion. But we think they do not represent him in a state of actual insanity. This evidence, like that of the other witnesses, describes the master as a man whose conduct, at times, was like that of a madman, bordering on insanity; but it is precisely like that of a man almost constantly in a state of intoxication. Epilepsy, which is described as one of the consequences, may be considered, whilst it lasts, as a state of insanity, during which the patient is deprived of reason and judgment; but he is at the same time deprived of sense and consciousness, and is wholly incapable of doing any thing. *Delirium tremens* is also one of the forms of insanity consequent on excessive drinking, and may be, though it is not often, of considerable duration; but we see no evidence here of *delirium tremens,* or, if at any time it did exist, it does not seem to have been of any duration, or that any barratrous act was done during the paroxysm.

It does appear, that many of the acts relied on to establish the proof of barratry were done by the master whilst in a state of intoxication, and when no state of actual insanity had supervened, if any such did supervene; and it does not distinctly appear, that any such act, causing either of the losses complained of, did take place whilst the master

was in a fit of *delirium tremens,* or laboring under any other form of insanity, and therefore the court are of opinion, that the defendants are responsible for the losses directly attributable to the peril insured against.

But the court are of opinion, that the plaintiffs are not entitled to recover demurrage, or damage arising from the delay of the vessel and the retardation and ultimate loss of the voyage. It was not a damage done to the vessel specifically, or to the outfits specifically, and therefore not covered by the contract of insurance. The contract was not, that the vessel should proceed on her voyage within any time, or that she should prosecute her voyage at all, but only that, during the prosecution of the voyage described, the vessel and the outfits should be safe against the perils insured against.

The case is to be referred to an assessor, to approve and assess the damages which the plaintiff is entitled to recover, pursuant to the agreement of the parties, according to the following directions : —

1. To ascertain and allow all losses of the ship's tackle, apparel, furniture, and boats, and all articles of the ship's outfits or supplies sold, or otherwise disposed of, by the master, including money, if any, furnished by the owners to the master, for the purchase of refreshments or supplies, or other necessary expenses of the voyage.

2. To ascertain and allow all damages to the hull, sails, rigging, tackle, and apparel of the vessel, whilst lying at Tahiti, when disabled from pursuing her voyage by the sale and disposition of her boats and outfits, by the damage in her rigging and sails, and by the desertion of her crew.

3. To ascertain and allow the actual expenses of sending the vessel home, that measure being taken for the benefit of all concerned, and to save and prevent a total loss.

4. To make no allowance for demurrage or damage arising from the delay of the vessel in her progress, and the retardation of the voyage.

5. To hear the parties after due notice, and make report to the court, as soon as conveniently may be.