## Commonwealth vs. Daniel Horne.

Hampden. May 7, 2013. - September 16, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Malice. Wanton or Reckless Conduct. Joint Enterprise. Practice, Criminal,* Instructions to jury, Double jeopardy. *Evidence,* Joint enterprise, Impeachment of credibility, Exculpatory. *Witness,* Impeachment. *Constitutional Law,* Double jeopardy. *Firearms.*

At a murder trial, the judge erred in declining to instruct the jury on involuntary manslaughter, where the evidence supported the reasonable inference that the defendant, who had fired a rifle at the darkened front-room window of an apartment in the early morning, did not knowingly discharge his weapon in the direction of a person or group of people; therefore, the jury should have been permitted to consider whether the defendant's conduct created a plain and strong likelihood of death — or, alternatively, only a high degree of likelihood of substantial harm — to someone inside the apartment. [443-446]

At a murder trial, the judge appropriately instructed on joint venture liability, where there was some evidence that another person participated in the shooting with the defendant, including evidence, highlighted by the defendant as part of his defense, that this other person fired the shots that killed the victim. [446-447]

At a criminal trial, the judge did not abuse his discretion in allowing the prosecutor to impeach a defense witness's credibility by eliciting testimony from that witness concerning her failure to bring exculpatory information to the attention of the police, where the Commonwealth had laid a sufficient foundation that the witness understood that the information was important and potentially exculpatory, that she was motivated to help the defendant, and that she had the opportunity to convey the information to authorities. [447-449]

A criminal defendant's convictions on two indictments charging possession of a rifle outside his residence or place of business, in violation of G. L. c. 269, § 10 (*a*), were not duplicative, where the evidence at trial supported a finding that the defendant, who was in possession of a rifle when he confronted an individual in the middle of a street, returned home after this confrontation and went back outside with the rifle several hours later, thus committing a second violation. [449-452]

INDICTMENTS found and returned in the Superior Court Department on October 28, 2009.

The cases were tried before *C. Jeffrey Kinder,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Jane Larmon White*, Committee for Public Counsel Services, for the defendant.

*Marcia B. Julian*, Assistant District Attorney, for the Commonwealth.

Duffly, J. At approximately 1:30 A.M. on October 18, 2009, eight bullets were fired at the front-room window of a first-floor apartment in Springfield; the window was covered by venetian blinds and dark curtains. Four of those bullets struck and killed nineteen year old Brittany Perez as she stood near the window. The defendant, who was seen fleeing from the scene of the shooting, was convicted by a Superior Court jury of murder in the second degree. He was convicted also of possession of ammunition without a firearm identification (FID) card and of two separate counts of unlicensed carrying of a rifle outside his residence or place of business.

On appeal, the defendant contends that a number of errors at trial require reversal of his convictions. He asserts error in the judge's decision not to instruct the jury on involuntary manslaughter; the judge's instruction on joint venture liability; and the prosecutor's improper impeachment of a defense witness's credibility. In addition, the defendant argues that the two convictions of the unlicensed carrying of a rifle are duplicative.

We conclude that the judge erred in declining to instruct the jury on involuntary manslaughter, where the jury reasonably could have found that the defendant did not know the room was occupied when he fired the rifle at the window and, therefore, that the defendant's conduct was wanton or reckless but not necessarily conduct that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow. Consequently, the defendant's conviction of murder in the second degree cannot stand. We reject the defendant's remaining claims of trial error and conclude also that the firearms convictions are not duplicative.

*Background.* We summarize the facts the jury could have found, reserving certain details for discussion of the issues raised. On October 16, 2009, the defendant's television was

taken from his apartment in Springfield by someone whose name he later learned might have been Joseph. On October 17, Joseph Darco was attending a birthday party at the victim's apartment, which was located on the first floor of a building on the same street as the defendant's apartment, a few houses away. Shortly after sunset, a party guest looked outside after hearing someone yell, "I want my TV," and saw the defendant holding a gun. At that point, Darco was outside standing in front of the victim's apartment. The defendant approached Darco, asked for "Joe," and then pulled a large gun from his pants, which Darco recognized as a .22 caliber rifle. Following a brief interaction, the defendant put the rifle back in his pants, and Darco went back to the party; the defendant returned to his apartment. A few hours later, the defendant again appeared in front of the victim's house, accompanied by his friend Ernest Haley and two other men. The victim's mother heard the men causing a commotion outside and told them to "take that down the street." They complied, and the defendant walked back in the direction of his apartment.

By the early morning hours of October 18, the birthday party had ended. At approximately 1:30 A.M., the victim was standing with her mother inside the apartment, in front of a window that looked out onto the street but was covered by venetian blinds and dark curtains. As the victim and her mother were talking, her mother heard a noise and turned around. When she turned back, she saw her daughter fall to the ground. The victim's mother ran outside and saw the defendant running down the street toward his apartment.[1] One of the defendant's neighbors, who was awakened by "pop" sounds that he thought were fireworks, looked out his bedroom window, which faced a driveway that ran between his building and that of the defendant on the opposite side; he saw the defendant and Haley coming toward him from the direction of the victim's apartment. One of the men appeared to hand something to the other, and the two then walked to the end of the driveway, where they placed something next to a garage.

Springfield police officers arrived on the scene shortly after 1:30 A.M. Based on information provided by the victim's mother,

---

[1]The victim's mother testified that the defendant was alone.

police located the defendant and Haley in the defendant's apartment. Cartridge casings recovered from outside the victim's apartment building were determined to have come from bullets fired by the .22 caliber rifle that police recovered from the area next to the defendant's apartment building.

*Discussion.* 1. *Instruction on involuntary manslaughter.* The defendant does not contest the sufficiency of the evidence to support a conviction of murder in the second degree but contends that, based on evidence viewed in the light most favorable to him, the jury reasonably could have found him guilty of involuntary manslaughter. Therefore, he claims, the judge erred by declining his request to instruct the jury on involuntary manslaughter.

"A fine line distinguishes murder in the second degree based on third prong malice from the lesser offense of involuntary manslaughter." *Commonwealth* v. *Lyons*, 444 Mass. 289, 293 (2005).[2] The difference between murder based on third prong malice and involuntary manslaughter "lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew." *Id.*, quoting *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992). "The risk for the purposes of third prong malice is that there was a plain and strong likelihood of death. . . . The risk that will satisfy the standard for . . . involuntary manslaughter 'involves a high degree of likelihood

---

[2]Murder in the second degree is an unlawful killing with malice. *Commonwealth* v. *Earle*, 458 Mass. 341, 346 (2010). "Malice can be established by proving any of three facts, or 'prongs': (1) the defendant intended to cause the victim's death; (2) the defendant intended to cause grievous bodily harm to the victim; or (3) the defendant committed an intentional act which, in the circumstances known to the defendant, a reasonable person would have understood created a plain and strong likelihood of death." *Id.* The Model Jury Instructions on Homicide released in March, 2013, simplify the definition of murder in the second degree by omitting the term "malice" in describing the requisite mens rea for that offense. See Model Jury Instructions on Homicide 57 (2013).

"Involuntary manslaughter is an unintentional, unlawful killing caused by wanton or reckless conduct." *Commonwealth* v. *Earle, supra* at 347. "The essence of wanton or reckless conduct is intentional conduct . . . which . . . involves a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944).

that substantial harm will result to another.' " *Commonwealth* v. *Lyons, supra,* quoting *Commonwealth* v. *Sires, supra.*

Both murder in the second degree based on third prong malice and involuntary manslaughter involve subjective as well as objective elements. For murder, "[m]alice can be found if, in the circumstances subjectively known to the defendant, a reasonably prudent person would have known of the plain and strong likelihood that death would follow a contemplated act . . . . Similarly, for wanton and reckless conduct, the relevant inquiry is whether a defendant knew of facts that would cause a reasonable person to know of the relevant danger, or whether the defendant in fact knew of the danger." *Commonwealth* v. *Earle,* 458 Mass. 341, 347 n.9 (2010).

An involuntary manslaughter instruction must be given if "any 'reasonable view of the evidence would have permitted the jury to find "wanton and reckless" conduct rather than actions from which a "plain and strong likelihood" of death would follow.' " *Commonwealth* v. *Braley,* 449 Mass. 316, 331 (2007), quoting *Commonwealth* v. *Jenks,* 426 Mass. 582, 585 (1998). If so, the failure to instruct the jury on involuntary manslaughter entitles a defendant to a new trial. See, e.g., *Commonwealth* v. *Martinez,* 393 Mass. 612, 613 (1985). In conducting this inquiry, we consider the evidence in the light most favorable to the defendant. See, e.g., *Commonwealth* v. *Tolan,* 453 Mass. 634, 649 (2009).

Viewed in that light, the evidence here supports a reasonable inference that the defendant could not have seen into the room behind the covered window, and thus did not know that the room was occupied. When the defendant fired his rifle at the window, it was 1:30 A.M., the party had ended, and the window was covered by venetian blinds and dark curtains. There was nothing in the evidence to suggest that it was possible to see through the window's curtains and blinds, that shadows of people could be seen moving behind the covered window, or that sounds indicative of human occupation could be heard coming from the room. The jury could have found that a reasonable person with the defendant's subjective knowledge of the circumstances would have understood that firing at the window created a high degree of likelihood that substantial harm would result to another, but not a plain and strong likelihood that death would result.

In decisions considering the level of risk created by the discharge of a firearm that results in the killing of another, we have concluded that it is only when a defendant has reason to believe that he is firing in the direction of a person or crowd of people that his conduct creates nothing less than a plain and strong likelihood of death. See, e.g., *Commonwealth* v. *Jenks*, *supra* at 586 ("Firing a pistol seven times in a crowded room is more than wanton and reckless conduct risking substantial harm; it is malicious conduct in the plainest sense").[3] We have, however, limited that principle to circumstances where the defendant knowingly fires a weapon at a person or crowd, concluding that firing a weapon near, but not directed toward, a specific person or persons "is wanton and reckless behavior that may supply an element of murder in the second degree or of involuntary manslaughter." *Commonwealth* v. *Santiago*, 425 Mass. 491, 498 (1997). See *Commonwealth* v. *Braley*, *supra* at 332 (firing rifle multiple times, directed toward specific individuals, creates nothing less than plain and strong likelihood of death). Compare *Commonwealth* v. *Mack*, 423 Mass. 288, 290 (1996) ("Absent some evidence that the defendant's knowledge was impaired, intentionally discharging a firearm in the direction of another person creates a plain and strong likelihood of death"), with *Commonwealth* v. *Hawkins*, 157 Mass. 551, 553 (1893) (where defendant fired pistol into dimly lit street at night and hit someone over 200 feet away, wounding her, on facts found by jury, defendant would have been guilty of manslaughter had victim died).

Because the evidence supports the reasonable inference that the defendant did not knowingly discharge his weapon in the direction of a person or group of people, the jury should have been permitted to consider whether the defendant's conduct created a plain and strong likelihood of death, or, alternatively, only a high degree of likelihood of substantial harm, to someone inside the apartment. See *Commonwealth* v. *Lyons*, *supra*. A new trial is therefore required on the indictment charging murder

---

[3]Cf. *Commonwealth* v. *Childs*, 445 Mass. 529, 533-534 (2005) (no entitlement to involuntary manslaughter instruction where defendant intentionally fired gun into automobile, killing someone inside, in circumstances known to defendant that suggested that someone was inside vehicle); *Commonwealth* v. *Dyous*, 436 Mass. 719, 731 (2002) (same).

in the second degree. Because these issues may arise at retrial, we consider the defendant's other claims of error.

2. *Instruction on joint venture.* The defendant argues that the judge should not have instructed the jury on joint venture liability because there was insufficient evidence that more than one person was involved in the shooting. Since there was some evidence that another person participated in the shooting with the defendant, however, including evidence, highlighted by the defendant as part of his defense, that it was Haley who fired the shots,[4] we conclude that the judge appropriately instructed on joint venture. See, e.g., *Commonwealth* v. *Smith*, 460 Mass. 385, 389 (2011).

The jury heard evidence that Haley and the defendant were together for much of the day and evening prior to the shootings; that they discussed the theft of the defendant's television; that Haley accompanied the defendant on his second visit to the victim's apartment; and that, after the shooting, the defendant and Haley were seen coming from the direction of the victim's apartment building and acting together to hide what the jury could have inferred was the rifle that had been used in the shooting, before entering the defendant's apartment, where they were located by police.

To support a conviction on a theory of joint venture, the jury must find beyond a reasonable doubt that "the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 468 (2009). A jury may so find only "[w]hen there is evidence that more than one person may have participated in the commission of the crime . . . ." *Id.* at 467. However, "joint venture is neither a crime nor an element of a crime"; the participation of another person does not become an element of the offense. *Commonwealth* v. *Fluellen*, 456 Mass. 517, 522 (2010). Because there was evidence of the defendant's participation and intent that satisfied the standard for sufficiency set forth in *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), and there

---

[4]Defense counsel argued that Haley fired the shots because of a gang-related dispute involving retaliation and gang turf, and that the defendant was not involved in the shooting.

was some evidence that the defendant acted with another, the judge did not err in instructing the jury on joint venture.

3. *Impeachment by silence.* The defendant contends that the judge abused his discretion in allowing the prosecutor to impeach a defense witness's credibility by eliciting testimony from that witness concerning her failure to bring exculpatory information to the attention of police. Linda Houle, a clerk at the convenience store where the defendant was also employed, testified that, after the defendant had been arrested, Haley came to the store and asked her if she had heard anything about the defendant's case. When Houle said that she had not, Haley responded that the defendant "was a dirty dog and that he was going to get his and . . . that he should take the rap for" Haley. On cross-examination, the prosecutor elicited testimony from Houle that she was friendly with the defendant, had worked with him for several years, and, on the night of the shooting, had lent him a television to replace the one that had been stolen. In addition, Houle testified on cross-examination that she was aware at the time she spoke to Haley that the defendant had been arrested for a shooting in his neighborhood, and realized that Haley's statement was "important." The prosecutor elicited that, three months after the shooting, Houle related Haley's comments to a private investigator hired by the defense, but neither mentioned the encounter in her statement to police several months afterwards, nor telephoned police, visited the police station, or spoke with any of the Springfield police officers who frequented the convenience store where she worked about Haley's statements.

"The scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge . . . ." *Commonwealth* v. *Gagnon*, 408 Mass. 185, 192 (1990), *S.C.*, 430 Mass. 348 (1999), quoting *Commonwealth* v. *Underwood*, 358 Mass. 506, 513 (1978). A judge does not abuse his discretion by permitting counsel to impeach a witness's credibility through evidence of the witness's failure to bring exculpatory evidence to the police when "the natural response of a person in possession of exculpatory information would be to come forward in order to avoid a mistaken prosecution of a relative or a friend,"

and the witness nevertheless "chooses to remain silent rather than provide the police or prosecutors with the exculpatory information." *Commonwealth* v. *Hart*, 455 Mass. 230, 238 (2009), quoting *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 295 (1981). In such circumstances, the jury may draw the "reasonable inference that the exculpatory information is not credible, either because it is a recent contrivance or because the witness is biased toward the defendant." *Commonwealth* v. *Hart, supra.*

Nonetheless, since "a citizen ordinarily has no legal obligation to offer exculpatory information to law enforcement authorities," *Commonwealth* v. *Brown, supra,* counsel seeking to impeach a witness's credibility by eliciting testimony regarding her prior silence first must lay the proper foundation. Counsel must establish "that the witness knew of the charge against the defendant in sufficient detail to realize that [s]he possessed exculpatory information; that the witness had a reason to make the information available; [and] that the witness was familiar with the means of reporting it to authorities." *Commonwealth* v. *Cintron*, 435 Mass. 509, 522 (2001). "A witness's silence in such circumstances is akin to a witness's 'prior inconsistent statement,' and, therefore, has probative value." *Commonwealth* v. *Brown, supra* at 296.

The prosecutor laid the required foundation in this case by establishing that Houle understood that Haley's statement was important and potentially exculpatory, that she was motivated to help the defendant, and that she had the opportunity to convey the information to authorities. On appeal, the defendant argues that Houle had a good reason not to tell police about Haley's statement, namely that her position as a night-shift worker at a convenience store left her especially vulnerable to violent retaliation.[5] No such evidence was presented to the jury or discussed with the judge during a sidebar conference, however, nor was any such evidence elicited by defense counsel on redirect

---

[5]The defendant argues also that Linda Houle likely was afraid of Ernest Haley because of Haley's affiliation with a Springfield gang. The defendant concedes that no testimony was introduced indicating that Houle was aware that Haley was a gang member.

in an attempt to rehabilitate the witness.[6] See *People* v. *Dawson*, 50 N.Y.2d 311, 321-322 (1980) (where defense witness cross-examined concerning failure to come forward at earlier date, "the witness or the party for whom he was sworn always remains free to explain the witness' prior conduct or attempt to reconcile it with the witness' present testimony").

Because the proper foundation had been laid, there was no error in allowing the prosecutor to impeach Houle's credibility in this manner.

4. *Duplicative firearms convictions.* The defendant was convicted on two indictments charging possession of a rifle outside his residence or place of business, in violation of G. L. c. 269, § 10 (*a*). One indictment related to the defendant's possession of a rifle on October 17, 2009, when he confronted Darco in front of the victim's home. The second was based on the defendant's possession of a rifle on October 18, 2009, when he shot at the victim's window. The defendant contends that the two convictions violate principles of double jeopardy because they are premised on his continuous and uninterrupted possession of the same weapon.

Under the double jeopardy clause of the Fifth Amendment to the United States Constitution and Massachusetts common law, no person may be convicted twice for the same offense. See, e.g., *Commonwealth* v. *Rivas, ante* 184, 187-188 (2013), and cases cited. Determining whether two offenses are the same for purposes of double jeopardy is a matter of statutory interpretation, though the issue is one of constitutional magnitude. Cf. *Commonwealth* v. *Suero*, 465 Mass. 215, 221 (2013), quoting *Commonwealth* v. *Crocker*, 384 Mass. 353, 360 (1981) ("The prohibition against duplicative convictions ensures that 'the court does not exceed its legislative authorization by imposing multiple punishments for a single legislatively defined offense' ").

Where a defendant is convicted twice under the same statute,

---

[6]In defense counsel's rehabilitation of Houle, he did not attempt to elicit testimony about Houle's concern for her safety, but focused on the fact that police never asked her directly whether she had spoken to Haley following the defendant's arrest. The prosecutor subsequently elicited testimony from Houle that the defense investigator had not asked her about her interactions with Haley, but that she had volunteered the information.

a reviewing court must examine the statute and ask "what 'unit of prosecution' was intended by the Legislature as the punishable act." *Commonwealth* v. *Rabb*, 431 Mass. 123, 128 (2000). "When the Legislature defines the scope of a criminal act (the unit of prosecution), double jeopardy protects a defendant from being convicted twice under the same statute for committing just one unit of the crime." *State* v. *Adel*, 136 Wash. 2d 629, 634 (1998). We examine the language and purpose of the statute at issue in order to determine whether the statute "speak[s] directly to the issue of the appropriate unit of prosecution," and if it does not, then we proceed "to ascertain that unit, keeping in mind that any ambiguity that arises in the process must be resolved, under the rule of lenity, in the defendant's favor." *Commonwealth* v. *Rabb, supra.*

Relevant to discerning a criminal statute's unit of prosecution is the continuous offense doctrine, which recognizes that certain criminal statutes are intended to punish just once for a continuing course of conduct, rather than for each and every discrete act comprising that course of conduct. The continuous offense doctrine has its roots in *Crepps* v. *Durden*, 98 Eng. Rep. 1283, 1287 (K.B. 1777), where the court held that a baker who had sold four loaves of bread on Sunday committed a single offense of "exercising his ordinary trade" on Sunday, and not four offenses. The United States Supreme Court adopted the doctrine in *In re Snow*, 120 U.S. 274, 283-286 (1887). There, the defendant had been charged with three counts of unlawfully cohabiting with more than one woman. The charges were based on the defendant's continuous cohabitation with the same women over a period of approximately three years; each charge was based on one year of that three-year period. Relying on *Crepps* v. *Durden, supra,* the Court concluded that the defendant's continuous cohabitation with the same women supported only a single charge, because the charged offense was of a continuing nature. See *In re Snow, supra* at 281-286.

Applying the continuous offense doctrine, courts have concluded that the unlawful possession of a weapon is a single, continuing offense for purposes of double jeopardy. See, e.g., *United States* v. *Jones*, 533 F.2d 1387, 1391 (6th Cir. 1976), cert. denied, 431 U.S. 964 (1977) ("Possession is a course of

conduct, not an act; by prohibiting possession Congress intended to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in a firearm''); *Matter of Johnson* v. *Morgenthau,* 69 N.Y.2d 148, 152 (1987) (same).[7] As the United States Court of Appeals for the Seventh Circuit has noted, "to charge and punish a defendant for . . . separate 'possessions' of the same gun, there must be a relinquishment of both actual *and* constructive possession of the gun before it is reacquired" (emphasis in original). *United States* v. *Ellis,* 622 F.3d 784, 794 (7th Cir. 2010).

These cases inform our understanding of G. L. c. 269, § 10 (*a*),[8] which criminalizes carrying a rifle outside one's residence or place of business without a license to do so. Cf. *Commonwealth* v. *Johnson,* 461 Mass. 44, 55 n.14 (2011). As the statute makes clear, it is the fact of being outside one's residence or place of business while possessing the rifle without

---

[7]Cf. *United States* v. *Benjamin,* 711 F.3d 371, 378 (3d Cir. 2013), and cases cited ("the felon-in-possession crime in [18 U.S.C.] § 922[g][1] is a continuing offense"); *United States* v. *Chiaradio,* 684 F.3d 265, 272 (1st Cir.), cert. denied, 133 S. Ct. 589 (2012) (same); *United States* v. *Hope,* 545 F.3d 293, 296-297 (5th Cir. 2008) (same).

[8]General Laws c. 269, § 10 (*a*), provides in relevant part:

> "Whoever . . . knowingly has in his possession; or knowingly has under control in a vehicle; a rifle or shotgun, loaded or unloaded, without either:
>
> "(1) being present in or on his residence or place of business; or
>
> "(2) having in effect a license to carry firearms issued under [G. L. c. 140, § 131]; or
>
> "(3) having in effect a license to carry firearms issued under [G. L. c. 140, § 131F]; or
>
> "(4) having in effect a firearms identification card issued under section [G. L. c. 140, § 192B]; or
>
> "(5) having complied with the requirements imposed by [G. L. c. 140, § 192C] upon ownership or possession of rifles and shotguns; or
>
> "(6) having complied as to possession of an air rifle or BB gun with the requirements imposed by [G. L. c. 269, § 12B];
>
> "shall be punished by imprisonment in the state prison for not less than two and one-half years nor more than five years, or for not less than 18 months nor more than two and one-half years in a jail or house of correction."

the proper license that provides the necessary element support-
ing a conviction under G. L. c. 269, § 10 (a).[9] A defendant
ceases to violate G. L. c. 269, § 10 (a), when he brings the rifle
he was carrying back inside his residence or place of business.
Thus, the unit of prosecution under G. L. c. 269, § 10 (a),
*Commonwealth* v. *Rabb*, *supra* at 128, is the continuous posses-
sion of a rifle outside a person's residence or place of business.
Cf. *National Ass'n of Home Bldrs*. v. *Occupational Safety &
Health Admin.*, 602 F.3d 464, 467 (D.C. Cir. 2010) ("to define
the violation is to define the unit of prosecution").

Based on the foregoing, we conclude that an individual com-
mits a single violation of G. L. c. 269, § 10 (a), for the duration
of the uninterrupted period that he remains in possession of a
rifle that he carries outside his residence or place of business.
An individual who returns to his residence with a rifle that he
has been carrying (or relinquishes possession of that rifle), and
then goes back outside with the rifle, has committed a second
violation. See *State* v. *Williams*, 59 Conn. App. 603, 608 (2000)
(statute criminalizing carrying pistol outside home or business
without license is violated each time person carries pistol outside
home or business without having license). Cf. *United States* v.
*Ellis*, *supra*.

Here, the jury found that the defendant was in possession of
a .22 caliber rifle on October 17, 2009, when the defendant
confronted Darco in the middle of the street near the defend-
ant's home. Evidence at trial supported the inference that the
defendant returned home after this confrontation.[10] The jury
reasonably could have inferred that the defendant brought his
rifle back with him when he returned home. The jury found
that, several hours later, on October 18, the defendant was again
carrying a rifle outside his apartment, a new course of criminal
conduct. This evidence suffices to support the defendant's two
convictions of violating G. L. c. 269, § 10 (a).

---

[9]Indeed, the unlicensed possession of a rifle, whether inside or outside
one's residence or place of business, is a separate offense set forth in G. L.
c. 269, § 10 (h) (1). See, e.g., *Chardin* v. *Police Comm'r of Boston*, 465
Mass. 314, 315 n.5 (2013).

[10]The defendant's roommate testified that the defendant returned to their
apartment and told her that he had spoken with Joseph about the stolen
television.

*Conclusion.* The judgments of conviction on the indictments charging unlicensed possession of a rifle outside one's residence or place of business and possession of ammunition without a firearm identification (FID) card are affirmed. The judgment of conviction of murder in the second degree is vacated and set aside. Because there was sufficient evidence to support a conviction of involuntary manslaughter, on remand, the Commonwealth has the option of moving to have the defendant sentenced on the lesser included offense of involuntary manslaughter or of retrying the defendant for murder in the second degree. See *Commonwealth* v. *Rutkowski*, 459 Mass. 794, 800 (2011), and cases cited. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*