NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11507


COMMONWEALTH  vs.  EMMANUEL PINA.



Suffolk.     October 5, 2018. - February 12, 2019.

Present:  Gants, C.J., Lenk, Gaziano, & Lowy, JJ.



Homicide.  Evidence, Accident, Self-defense, Intent,
     Identification.  Self-Defense.  Intent.  Identification.
     Practice, Criminal, Capital case, Instructions to jury,
     Challenge to jurors, Assistance of counsel.




Indictments found and returned in the Superior Court
Department on October 27, 2009.

The cases were tried before Elizabeth B. Donovan, J., and a
motion for a new trial, filed on November 20, 2015, was
considered by Christine M. Roach, J.


Edward B. Fogarty for the defendant.
Sarah Montgomery Lewis, Assistant District Attorney (John
Pappas, District Attorney, also present) for the Commonwealth.


GAZIANO, J.  A Superior Court jury convicted the defendant

of murder in the first degree, on a theory of deliberate

premeditation, in the shooting deaths of Jovany M. Eason and

Manuel Monteiro.  At trial, the Commonwealth alleged that the

defendant and Eason were involved in an altercation inside a bar, then the fight spilled out into the street, where the defendant grabbed a handgun from his codefendant and fired at Eason.[1]  The defendant missed, but the stray round shattered a window in front of the bar and hit Monteiro, a bar employee, in the chest.  The defendant, according to the Commonwealth, then chased Eason down the street and shot him multiple times in the back.  As the defendant fled the scene, one of Eason's friends, Timothy Santos, shot at the defendant, and they exchanged several rounds of gunfire.[2]

In this consolidated appeal from his convictions and from the denial of his motion for a new trial, the defendant challenges a number of the judge's rulings and his instructions

---

[1] After a joint trial, the codefendant was convicted of murder in the first degree. Commonwealth v. Tavares, 471 Mass. 430, 431 (2015).  We vacated the conviction because the judge's erroneous instruction to on the law of joint venture created a substantial likelihood of a miscarriage of justice, where it precluded the jury from finding a lesser degree of guilt.  Id. at 439-442.  Had it been requested, the codefendant would have been entitled to an instruction on involuntary manslaughter, based, in part, upon evidence that he brought the gun to the scene, pointed the handgun at Eason, did not fire it, and may have intended only to scare or intimidate Eason.  Id. at 438-442.

[2] During this exchange, Timothy Santos was shot in the leg. The defendant was charged with armed assault with intent to murder, and assault and battery by means of a dangerous weapon for this shooting.  The jury were instructed on self-defense with respect to these charges, and the defendant was acquitted on both charges.

to the jury.  The defendant argues that the judge erred in denying his requests for an instruction on accident with respect to Eason's death, and instructions on voluntary and involuntary manslaughter with regard to Monteiro's death.  The defendant maintains that he was denied a fair trial because the judge miscalculated the number of preemptory challenges that had been exercised by his trial counsel, depriving him of two additional challenges that could have been made.  The defendant maintains also that the judge erred in allowing identification testimony by a police officer who identified the defendant as an individual shown in video surveillance footage, as well as by many of the others at the scene.  In addition, the defendant argues that trial counsel's failure to present an intoxication defense through available witnesses constituted ineffective assistance of counsel.  Finally, the defendant asks this court to exercise its extraordinary authority pursuant to G. L. c. 278, § 33E, and to grant him a new trial or to reduce the conviction to a lesser degree of guilt.

After considering all of the defendant's arguments, and conducting a thorough review of the trial record, we conclude that there is no reversible error, and no reason to disturb the verdicts.

1.  Background.  We summarize the facts that the jury could have found, reserving other facts for our discussion of specific

issues. Many of the events, both inside and outside the bar, were captured by the bar's security cameras, as well as by security cameras mounted on a nearby building.

In the early morning hours of August 2, 2009, an argument broke out at a bar and restaurant on Hancock Street in the Upham's Corner neighborhood of Boston. The argument started shortly after the codefendant and a companion entered the bar. In the entranceway, the codefendant greeted another patron with a hug, then said, "I don't understand why you hang with the Draper Street niggas." The victim, Jovany Eason, who was friendly with people from the Draper Street neighborhood, took exception. Eason approached the codefendant and they exchanged angry words. A bouncer moved in and separated the two men. The codefendant and his friend left the bar and walked away from the area; Eason did not leave.

The dispute continued inside the bar, where Eason argued with one of the codefendant's friends, Otelino Goncalves. The altercation moved from the entranceway to the rear of the bar near the restrooms. A few minutes later, the defendant, who was also a friend of the codefendant, entered the bar and headed directly to the men's restroom, where he joined Goncalves in arguing with Eason and some of Eason's friends. A fight broke out between the defendant and Eason and their respective friends. The bar owner, some of his employees, and a regular

customer named Adelberto Brandao separated the combatants. The defendant was escorted out of the bar through the front door. Eason left the bar on his own accord immediately before the defendant was ejected.

The hostilities spilled out onto Hancock Street, where Eason squared off to fight Goncalves in the middle of the street. Before any punches were thrown, the codefendant walked up to Eason and pointed a pistol at him. A patron inside the bar, Joao DePina,[3] observed the codefendant attempt to "rack" the handgun or, as the witness described it, "He was trying to get the bullet to shoot at something." Eason backed away. The defendant then grabbed the weapon from his codefendant's hand. He ran toward Eason, who was standing on the sidewalk in front of the bar, and fired. The defendant missed Eason, but the stray round, fired from a .45 caliber weapon, shattered a plate glass window near the front door of the bar and struck Monteiro in the chest. Monteiro, who was working a second job as a cook, had been watching the altercation on the street from inside the bar. He collapsed in the middle of the bar, and was pronounced dead by emergency medical technicians who arrived at the scene.

---

[3] Because Joao DePina shares a last name with multiple unrelated individuals who testified or were involved in this case, we refer to him by his first name.

Outside, the defendant chased Eason down Hancock Street while firing at Eason. The two passed a community center on the corner of Hancock Street and Jerome Street which had its own security cameras. At the three-way intersection of Hancock Street, Jerome Street, and Bird Street, the defendant ran to the right onto Jerome Street. Eason ran to the left onto Bird Street, and collapsed near the intersection shortly after he turned onto Bird Street.[4]

On Jerome Street, near Cushing Avenue, the defendant encountered Timothy Santos, one of Eason's friends. Santos, who was armed with a .380 caliber handgun, shot at the defendant, who fired back. Both men fired multiple rounds; the defendant hit Santos in the leg above the knee. A friend dropped Santos off at a hospital, where he refused to cooperate with police, and told his doctors that he woke up with the gunshot wound.[5]

Police officers found Eason lying face down on the ground near the intersection of Hancock Street and Bird Street. He had been shot in the lower back, in the upper back near his shoulder blade, and through the shoulder or upper arm. The medical

---

[4] A vehicle parked on Bird Street (on the side of the street opposite from where the victim collapsed) was hit with gunfire. The police also recovered a spent .45 caliber projectile in front of a funeral home on Columbia Road, more than a block away from the shootings on Hancock Street and Jerome Street.

[5] The police found two clusters of .45 caliber and .380 caliber spent shell casings on Jerome Street.

examiner extracted a .45 caliber projectile from Eason's lower back; the other two projectiles passed through his body.  At trial, the medical examiner opined that Eason died as a result of suffering two gunshot wounds to the torso.[6]

2.  Discussion.  a.  Instruction on accident.  Following the jury charge, the defendant requested that the judge instruct the jury that Eason's death could be excused as an accident.  Trial counsel argued, "[T]here was a gun battle on top of Jerome Street and that the person who was shooting down with a .45 could, in fact, in self-defense [have] shot Mr. Eason.  And that would fall under the category, as I'm thinking about it, accident."  Trial counsel also filed a supplemental request for jury instructions which read, in part,

> "In this case there is evidence that there was an exchange of gunfire between two individuals on Jerome Street . . . If you conclude that the government has failed to prove beyond a reasonable doubt that the person who shot Mr. Santos did not act in self-defense, then for purposes of the following instruction, you may consider whether the shooting death of Mr. Eason was or was not an accident."

The prosecutor urged the judge not to instruct on accident, on the ground that there was no basis in the evidence for such

---

[6] Martin Lydon, a Boston police department ballistics expert, examined the shell casings and projectiles recovered from the crime scenes.  He testified that the projectiles that killed Monteiro and Eason, and the projectile found on Columbia Road, were all fired from the same .45 caliber handgun.  He also testified that the spent .45 caliber shell casings found on or near Hancock Street, and the cluster of shell casings found on Jerome Street, were fired from the same weapon.

an instruction because the defendant fatally shot Eason prior to the firefight on Jerome Street.  The judge declined the motion that the jury be instructed on accident with respect to Eason. Because the defendant objected, we review to determine whether there was prejudicial error.  Commonwealth v. Martinez, 431 Mass. 168, 173 (2000).

Accident, like self-defense and defense of another, is an affirmative defense.  Commonwealth v. Podkowka, 445 Mass. 692, 699 (2006).  In the case of murder in the first or second degree, accident negates the element of intent to kill the victim.  Commonwealth v. Chambers, 465 Mass. 520, 536 n.15 (2013); Lannon v. Commonwealth, 379 Mass. 786, 790 (1980).  If "fairly raised" by the evidence, due process requires that the Commonwealth disprove accident beyond a reasonable doubt. Podkowka, supra; Commonwealth v. Palmariello, 392 Mass. 126, 145 (1984).  See Commonwealth v. Robinson, 382 Mass. 189, 203 (1981).  A judge, of course, should not instruct on accident where there is no evidence of an accident.  See Commonwealth v. Hutchinson, 395 Mass. 568, 578-579 (1985).

A defendant is entitled to an accident instruction in a shooting death "only where there is evidence of an unintentional or accidental discharge of a firearm."  Commonwealth v. Millyan, 399 Mass. 171, 182 (1987).  See e.g., Commonwealth v. Neves, 474 Mass. 355, 371 (2016) (accident instruction warranted based on

defendant's statements to police that gun discharged accidentally when taxicab driver accelerated and grabbed defendant's hand); Commonwealth v. Zezima, 387 Mass. 748, 750, 756 (1982) (accident instruction predicated on evidence that firearm discharged as third party attempted to take gun out of defendant's hand); Commonwealth v. Zaccagnini, 383 Mass. 615, 616 (1981) (reasonable doubt concerning accident raised where defendant testified victim had gun and it discharged as they struggled for control of it); Lannon, 379 Mass. at 787, 790 (petitioner testified fatal shot was fired when screen door hit gun he was holding, causing it to discharge).

The circumstances in Millyan, 399 Mass. at 174-176, are instructive as to the defendant's claim that it was error not to give an accident instruction based on the evidence before the jury. In that case, the defendant entered a bar carrying a loaded shotgun; he was seeking to avenge the earlier stabbing of one of his friends, and to preempt a threat made to do him similar harm. Id. at 174-175. The defendant announced that if he saw any members of a rival motorcycle gang in the bar, "he was going to blow them away." Id. at 175. After issuing this threat, the defendant pointed the shotgun toward the rear of the bar and fired a shell in the victim's direction. Id. at 176. The victim, who was standing in a poolroom adjacent to the bar, was fatally struck in the head by a number of pellets. Id. at

175-176.  On appeal, the defendant contended that an accident instruction was required because he had fired the shotgun recklessly in a crowded barroom.  Id. at 182.  We held that the defendant's claim that the victim's death was the unfortunate by-product of an "intentional discharge of the shotgun" did not raise the legal defense of accident.  Id.

Here, the defendant claimed that he accidentally shot the victim while exercising his right to self-defense.  The theories of self-defense and accident are "mutually exclusive." Commonwealth v. Barton, 367 Mass. 515, 518 (1975).  A defendant who shoots another in the lawful exercise of self-defense is entitled to an accident instruction where the facts independently support an argument that the weapon was discharged accidentally.  Id. at 517-518.  See Commonwealth v. Lacasse, 1 Mass. App. Ct. 590, 598 (1973), S.C., 365 Mass. 271 (1974) (discussing "anomalous doctrine of accidental self-defense"). In Barton, supra at 517, we noted that the evidence warranted an instruction on the independent theories of self-defense and accident because the defendant claimed that "the gun went off" during the fatal struggle.  Similarly, in Zaccagnini, 383 Mass. at 616, the defendant's testimony that the victim had a gun, and that it "went off" as they wrestled for control of it, raised "a reasonable doubt concerning whether the shooting was accidental, and . . . whether the defendant acted in self-defense."

Here, the defendant was not entitled to an accident instruction because there was no evidence that he unintentionally or accidentally discharged a firearm. See Commonwealth v. Gibson, 424 Mass. 242, 246 n.3, cert. denied, 521 U.S. 1123 (1997) ("defendant's own testimony that he fired the gun without aiming eliminated any issue as to accident"). Based on the number of .45 caliber shell casings deposited on Jerome Street, it is clear that the defendant intentionally fired multiple rounds at Santos after being fired upon. The defendant's claim that Eason's death was the unfortunate by-product of an intentional shooting at another person does not raise the affirmative defense of accident. Millyan, 399 Mass. at 182.

b. Transferred intent self-defense. The circumstances of this case require us, in the exercise of our plenary review pursuant to G. L. c. 278, § 33E, to consider an issue of first impression. In other States, the shooting death of a bystander during an act of self-defense may be excused by application of transferred intent self-defense.[7] See W.R. LaFave, Criminal Law,

---

[7] We did not reach this issue in Commonwealth v. Santiago, 425 Mass. 491 (1997), S.C., 427 Mass. 298 (1998) and 428 Mass 39, cert. denied, 525 U.S. 1003 (1998), even though the issue potentially was raised by the evidence in that case. In Santiago, supra at 492-493, the defendant and a rival group shot at each other in a public park. A bystander was fatally struck by a bullet fired by either the defendant or one of the men in the other group. Id. Defense counsel argued that the defendant

§ 6.4, at 449 (6th ed. 2017) (LaFave). We conclude that the defendant is not entitled to relief pursuant to G. L. c. 278, § 33E, because the facts in this case do not support the application of transferred intent self-defense, and we leave its adoption as a matter of our homicide jurisprudence for another day.

The theory of transferred intent is well established in the Commonwealth and, indeed, forms the basis for the defendant's liability for the shooting death of Monteiro. See Model Jury Instructions on Homicide at 45-46 (2018). Under this theory, "if a defendant intends to kill a person and in attempting to do so mistakenly kills another person, such as a bystander, the defendant is treated under the law as if he intended to kill the bystander." Commonwealth v. Taylor, 463 Mass. 857, 863 (2012). See Commonwealth v. Vazquez, 478 Mass. 443, 453 (2017) (transferred intent applies where defendant misidentifies victim); Commonwealth v. Fisher, 433 Mass. 340, 344 n.5 (2001)

_____

could not be found guilty, as a matter of law, because the Commonwealth could not prove either that he fired the fatal shot, or that he had instigated the shootout. Id. at 503. We rejected the defendant's claim. As to whether the defendant fired the fatal shot, we held, "where the defendant chooses to engage in a gun battle with another with the intent to kill or do grievous bodily harm and a third party is killed, the defendant may be held liable for the homicide even if it was the defendant's opponent who fired the fatal shot." Id. We held also that evidence that the defendant retrieved a gun and made no attempt to flee from the hostile group was sufficient to disprove self-defense. Id.

("the jury need only find that the defendant intended to kill one person and, in the course of an attempt to do so, killed another" [quotation and citation omitted]).

In a number of States, the theory of transferred "innocent" intent has been applied to excuse the shooting death of a bystander during the lawful exercise of self-defense.[8]  See e.g., State v. Stevenson, 38 Del. 105, 111 (1936); Pinder v. State, 27 Fla. 370, 377-379, 383-387 (1891); People v. Jackson, 390 Mich. 621, 624 (1973); State v. Green, 206 S.E.2d 923 (W. Va. 1974). See generally Annot., Unintended Killing of or Injury to Third Person During Attempted Self-defense, 55 A.L.R. 3d 620 (1974). In LaFave, supra at 449, the concept is explained as follows:

> "There are, of course, some situations where, though A intentionally kills or injures B, A is not guilty of murder or battery. . . . Now suppose A shoots at B under these circumstances but, missing B, hits and kills or injures C, an innocent bystander.  If A aims at his attacker B in proper self-defense, but hits C instead, he is not generally guilty of murder or battery of C.  Once again, he is only as guilty as to C as he would have been had his aim been accurate enough to have hit B."

---

[8] One way to distinguish between transferred intent and transferred intent self-defense is to focus on the intent being transferred.  In transferred intent, when a defendant acts with the intent to harm an intended victim, but because of bad aim harms a third person, the law imposes liability just as if the defendant actually had harmed the intended target.  See Commonwealth v. Taylor, 463 Mass. 857, 863 (2012).  In transferred intent self-defense, the defendant's innocent intent, where he or she was privileged to use deadly force in the proper exercise of self-defense, is transferred to the unintended victim.  See D.A. Dripps, R. N. Boyce, R.M. Perkins, Criminal Law and Procedure, at 785 (13th ed. 2017).

We have not as yet recognized transferred intent self-defense as a matter of our homicide jurisprudence, and need not do so in this case. Viewed in the light most favorable to the defendant, the evidence established that he fired errant gunshots in the direction of Bird Street, where Eason collapsed. The defendant, however, cannot point to any evidence that he fatally shot Eason during his gun battle with Santos. To the contrary, the evidence supported a reasonable conclusion that the defendant shot Eason prior to the gunfight on Jerome Street, based on shell casings recovered on Hancock Street, surveillance footage of Eason grabbing his back in the spot where he suffered a fatal gunshot wound, and the fact that Eason was found unresponsive a short distance along Bird Street after rounding the corner from Hancock Street. See Commonwealth v. Perry, 432 Mass. 214, 225 (2000) ("Where a defendant causes injury which, along with other contributing factors or medical sequella of the injury, leads to death, jurors may determine that the defendant's acts were the proximate cause of the injury"); Commonwealth v. Rhoades, 379 Mass. 810, 825 (1980) (defendant causes victim's death where his actions were "a cause, which, in the natural and continuous sequence produced death, and without which the death would not have occurred" [citation omitted]). Regardless of whether Eason was exposed to additional gunfire near Bird Street, after an earlier injury, we are not required

to apply the theory of transferred intent self-defense to correct a miscarriage of justice.

c. Instruction on manslaughter. A manslaughter instruction is required if the evidence, considered in the light most favorable to a defendant, would permit a verdict of manslaughter and not murder. See Commonwealth v. Nelson, 468 Mass. 1, 13 (2014); Commonwealth v. Colon, 449 Mass. 207, 220, cert. denied, 552 U.S. 1079, S.C., (2007), 479 Mass. 1032 (2017). "In deciding whether a manslaughter instruction is supported by the evidence, all reasonable inferences must be resolved in favor of the defendant," Commonwealth v. Vanderpool, 367 Mass. 743, 746 (1975), but a judge should not instruct the jury "on a hypothesis not supported by the evidence." Id.

We first address the defendant's request for an involuntary manslaughter instruction related to the death of Monteiro. At the charge conference, the defendant requested an instruction on involuntary manslaughter.[9] He agreed that there was some circumstantial evidence of "an intent to kill Mr. Eason at that point." He argued, however, that the fatal shot that shattered the bar window and struck Monteiro possibly had been fired as "a warning shot," or in an "attempt to just injure somebody." The

---

[9] In his memorandum in support of this argument, the defendant sought an instruction on involuntary manslaughter based on wanton or reckless conduct; at the conference itself, he did not specify this reasoning.

judge declined to instruct the jury on involuntary manslaughter, and the defendant objected at the conclusion of the charge.  We review to determine whether there was error and, if so, whether the error prejudiced the defendant.  See Commonwealth v. Rogers, 459 Mass. 249, 252-253, cert. denied, 565 U.S. 1080 (2011).

The common-law crime of manslaughter is defined as an unlawful killing without malice.  Commonwealth v. Webster, 5 Cush. 295, 308 (1850).  See Commonwealth v. Vizcarrando, 427 Mass. 392, 396 (1998), S.C., 431 Mass. 360 (2000) and 447 Mass. 1017 (2006) ("Malice is what distinguishes murder from manslaughter").  The distinction between murder and manslaughter "means that a verdict of manslaughter is possible only in the absence of malice."  Commonwealth v. Pagan, 471 Mass. 537, 546, cert. denied, 136 S. Ct. 548 (2015).  The lesser included offense of involuntary manslaughter, by contrast, is defined as "the unintentional result of an act committed with such disregard of its probable harm to another as to amount to wanton or reckless conduct."  Commonwealth v. Souza, 428 Mass. 478, 492(1998), quoting Commonwealth v. Nichypor, 419 Mass. 209, 217 (1994).  See Commonwealth v. Welansky, 316 Mass. 383, 396-399 (1944).

"In determining whether an involuntary manslaughter instruction must be given, we ask whether any reasonable view of the evidence would have permitted the jury to find wanton and

reckless conduct rather than actions from which a plain and strong likelihood of death would follow" (quotations and citation omitted). Commonwealth v. Braley, 449 Mass. 316, 331 (2007). We agree with the defendant's argument that a judge is required to provide an instruction on involuntary manslaughter where there is evidence that a defendant "was not pointing or aiming a gun at the victim, but was rather aiming in the air or at the ground." Commonwealth v. Iacoviello, 90 Mass. App. Ct. 231, 245 (2016). We note also, as we observed in the codefendant's case, that a defendant is entitled to an instruction on involuntary manslaughter based on evidence that he or she pointed a loaded gun at a victim with the intent to scare or intimidate. See Tavares, 471 Mass. at 438.

The defendant's actions in Commonwealth v. Horne, 466 Mass. 440 (2013), illustrate the type of behavior that has been considered wanton or reckless, as opposed to an act of third prong malice, in the context of gunshots fired at a person or into a crowd of people. In Horne, supra at 444, the evidence supported a reasonable inference that the defendant, in the early morning, fired a rifle through a windows covered by venetian blinds and dark curtains. "There was nothing in the evidence to suggest that it was possible to see through the window's curtains and blinds, that shadows of people could be seen moving behind the covered window, or that sounds indicative

of human occupation could be heard coming from the room."  Id.
"[I]t is only when a defendant has reason to believe that he is
firing in the direction of a person or crowd of people that his
conduct creates nothing less than a plain and strong likelihood
of death."  Id. at 445.  Based on this, we held that the jury
should have been permitted to consider whether the shooting was
an act of wanton or reckless conduct.  Id. at 444-445.  See
Commonwealth v. Kinney, 361 Mass. 709, 712 (1972) (involuntary
manslaughter instruction warranted based on defendant's
testimony that he produced gun while holding onto railing in
stairway and being beaten by others, pointed it up towards
ceiling, and "heard the gun go off").

By contrast, we held in Commonwealth v. Dyous, 436 Mass.
719, 731 (2002), that the defendant, whose coventurer shot into
an occupied motor vehicle, was not entitled to an instruction on
involuntary manslaughter.  We noted that "there was no evidence
that they discharged their weapons believing no one was in the
automobile," id. at 731, or that the coventurers intended only
to vandalize the vehicle.  Id. at 732.  Nor was there evidence
that anyone had fired into the air.  Id.  Rather than wanton or
reckless conduct, the evidence "pointed singularly to an intent
to kill."  Id.  See Braley, 449 Mass. at 332 ("Firing a rifle
multiple times, directed toward specific individuals, provides a
sufficient basis to conclude that the defendant understood the

likely deadly consequences of his actions"); Commonwealth v. Jenks, 426 Mass. 582, 586 (1998) ("Firing a pistol seven times in a crowded room is more than wanton and reckless conduct . . . it is malicious conduct in the plainest sense"); Commonwealth v. Mack, 423 Mass. 288, 290 (1996) ("Absent some evidence that the defendant's knowledge was impaired, intentionally discharging a firearm in the direction of another person creates a plain and strong likelihood of death" [footnote omitted]).

In this case, the evidence did not support an instruction on involuntary manslaughter.  The jury were presented with overwhelming evidence that the defendant fired a gun at Eason, in front of a crowded bar.  The projectile missed Eason, shattered a window, and struck Monteiro in the chest.  The defendant's argument that he meant to fire a warning shot (apparently at chest level of the six-foot tall Eason) is entirely speculative. See Commonwealth v. Santo, 375 Mass. 299, 305-306 (1978) ("a judge is not required to instruct on a hypothesis that is not supported by the evidence").  The defendant's argument that he meant only to injure is equally unavailing.  As discussed, discharging a shot at another person, regardless of whether the shot is meant to injure or kill, suffices to establish second or third prong malice, as it "creates a plain and strong likelihood of death."  See Mack, 423

Mass. at 290. The judge properly denied the defendant's request for an instruction on involuntary manslaughter.

We turn to the question of voluntary manslaughter. The defendant requested an instruction on voluntary manslaughter at the charge conference, without specifying the grounds for his request. On appeal, he contends that the judge should have provided an instruction on voluntary manslaughter based on the theory of excessive use of force in self-defense. This argument, however, is inconsistent with the defendant's earlier position concerning the availability of a self-defense claim.

During the course of the charge conference, the defendant conceded that there was no issue of self-defense with respect to the shooting in front of the bar. While discussing the issue of self-defense, with respect to the shooting of Santos on Jerome Street, the prosecutor requested that the instructions be "crystal clear" that self-defense applied only to "what happened on Jerome Street with Santos." Defense counsel responded, "I would not argue any differently." The prosecutor repeated, "It [self-defense] has no bearing on what happened at [the bar] or up until the point that [the defendant] allegedly went up Jerome Street and engaged in whatever happened up there with Mr. Santos. That's all I'm requesting . . . that we're crystal clear on that." The judge stated, "I will be very specific that it only applies to [Santos]." Defense counsel agreed to this,

and pointed out that his written request for jury instructions on self-defense exclusively referenced the shooting of Timothy Santos.

"An objection adequately preserves the claimed error so long as counsel makes known to the court the action which he desires the court to take or his objection to the action of the court" (quotations and citation omitted). Commonwealth v. McDonagh, 480 Mass. 131, 138 (2018); Mass. R. Crim. P 24 (b), 378 Mass. 895 (1979) (party must specify "the matter to which he objects and the grounds of his objection"). An objection to the omission of a voluntary manslaughter instruction usually is sufficient to alert a trial judge as to the necessity of that charge under any viable theory of voluntary manslaughter, and to preserve a defendant's appellate rights. See Commonwealth v. Maskell, 403 Mass. 111, 115 (1988). In this case, however, the judge could not reasonably have considered the possibility of an instruction on voluntary manslaughter predicated on the use of excessive force in self-defense, because the defendant specifically disavowed this theory. We therefore review the defendant's unpreserved claim of error for a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

"Voluntary manslaughter is an unlawful killing 'arising not from malice, but from . . . sudden passion induced by reasonable

provocation, sudden combat or excessive force in self-defense.'" Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006), quoting Commonwealth v. Carrion, 407 Mass. 263, 267 (1990).  An instruction on voluntary manslaughter based on excessive force in self-defense is warranted where there is evidence that the defendant was entitled to use some amount of force in self-defense.  See Commonwealth v. Anestal, 463 Mass. 655, 674 (2012); Commonwealth v. Walker, 443 Mass. 213, 218 (2005).  For a defendant to use deadly force, the defendant must have "a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm." See Anestal, supra, quoting Commonwealth v. Houston, 332 Mass. 687, 690 (1955).  In addition, the privilege to use deadly force "arises only in circumstances in which the defendant uses all proper means to avoid physical combat."  Commonwealth v. Mercado, 456 Mass. 198, 209 (2010).

We conclude that the absence of an instruction on voluntary manslaughter did not create a substantial likelihood of a miscarriage of justice.  In his brief, the defendant contends that he was entitled to use deadly force outside the bar to protect himself, or his friend Goncalves, for several reasons. There was an "explosive" argument between Goncalves and Eason outside the bar; the defendant argued with Brandao (who

allegedly was aligned with Eason); "all the while" Brandao pointed "what the defendant suggests is a firearm."

The defendant did not testify, and the record does not otherwise contain sufficient evidence to support an instruction on self-defense.  Brandao denied that he possessed a firearm in front of the bar, and no witnesses testified that Brandao participated in the altercation, or that Brandao threatened the defendant with a firearm.[10]  Moreover, the defendant did not establish that he was somehow justified in using deadly force to protect himself or another from Eason (who was unarmed).

d.  Peremptory challenges.  There is no dispute, as the transcript indicates and the Commonwealth concedes, that the defendant was deprived of the right to exercise two peremptory

---

[10] On appeal, the defendant contends that a bartender, Francisco Amado, testified that an unidentified person (presumably Adelberto Brandao) was pointing something moments before the first gunshot, and that the object in his hand could have been a gun.  The defendant mischaracterizes Amado's testimony.  On cross-examination, Amado testified:

Q.:  "Does it appear that he's pointing something at people?"

A.:  "Yes."

Q.:  "Does it appear he's possibly pointing a gun?"

A.:  "He's pointing something, but I can't --"

Q.:  "Okay.  So you can't tell?"

A.:  "No."

challenges.  The issue presented on appeal is whether the defendant was able to show prejudice or injury resulting from that error.  See Commonwealth v. Bockman, 442 Mass. 757, 762-763 (2004).

The judge decided to empanel sixteen jurors.  As a result, each party was entitled to sixteen peremptory challenges.  See Mass. R. Crim. P. 20 (c) (1), 378 Mass. 889 (1979).  The judge began the empanelment process by introducing the case and the parties, and asking the entire venire general questions, as then required by G. L. c. 234, § 28, and Mass. R. Crim. P. 20 (b) (1).  Thereafter, she brought each juror to sidebar for individual questioning, focused on bias against people from Cape Verde, bias against individuals who consumed alcohol, and familiarity with the neighborhood bar.  At the conclusion of individual questioning, the prosecutor and the two defense attorneys were required to exercise peremptory challenges on any juror the judge had declared indifferent.

On the final day of the three-day empanelment, the defendant exercised a peremptory challenge to excuse a potential juror called to fill seat number 14.  The judge mistakenly informed defense counsel, "That takes care of all your challenges."  At that point, the defendant had exercised fourteen peremptory challenges and had two remaining.  Later, defense counsel stated, "It is my understanding, and I might be

wrong, that I had two challenges left." Thereafter, the judge sat two jurors: juror no. 69 (seat number 16) and juror no. 80 (seat number 10) (to replace an excused juror). The defendant, in both instances, did not object to the jurors being seated or raise a challenge for cause.

While not guaranteed by the United States Constitution or the Massachusetts Declaration of Rights, peremptory challenges "historically [have] performed an important role in assuring the constitutional right to a fair trial" (quotation and citation omitted). Bockman, 442 Mass. at 762. See Commonwealth v. Mello, 420 Mass. 375, 396 (1995); Commonwealth v. Wood, 389 Mass. 552, 559 (1983). The ability to strike a potential juror for no reason at all affords a party the option of eliminating from the jury an individual who may harbor a subtle bias not fully vetted during voir dire. Bockman, supra.

In Wood, 389 Mass. at 564, we stated that "the erroneous denial of the right to exercise a peremptory challenge is reversible error without a showing of prejudice." See Commonwealth v. Green, 420 Mass. 771, 776 (1995); Commonwealth v. Hyatt, 409 Mass. 689, 692 (1991). Nonetheless, we also have held that the purposes underlying the "award and exercise of a peremptory challenge" are satisfied where no person is seated as a juror "against whom the defendant could claim suspected or perceived bias, and no person against whom he had exercised or

attempted to exercise a peremptory challenge."  See Bockman, 442 Mass. at 763.  See also Commonwealth v. Smith, 461 Mass. 438, 443 (2012) (no possibility of prejudice where challenged juror selected as alternate and did not deliberate); Commonwealth v. Leahy, 445 Mass. 481, 497 (2005) (defendant did not establish that he would have exercised proper peremptory challenge had another been available where he did not use his last challenge until final juror was seated); Commonwealth v. Auguste, 414 Mass. 51, 58 (1992) (defendant "suffered a prejudicial diminution of peremptory challenges" based on showing that he would have exercised proper peremptory challenge had another been available).

We conclude that the defendant is not entitled to a new trial based on the erroneous deprivation of the two preemptory challenges.  The defendant has not shown a violation of his right to an impartial jury.  He did not object when the judge advised him that he had exhausted his peremptory challenges.  He did not argue at trial, in his motion for a new trial, or on appeal, that he would have used a remaining peremptory challenge to exclude either juror no. 69 or juror no. 80.  Indeed, the defendant did not contend that juror no. 69 or juror no. 80 were partial or biased, and did not otherwise voice any dissatisfaction with these jurors.  See Bockman, 442 Mass. at 762.

In addition, the defendant received all of the rights afforded by State law.  At the time of the defendant's trial, G. L. c. 234, § 32, provided, "No irregularity in . . . [the] empanelling of jurors shall be sufficient to set aside a verdict, unless the objecting party has been injured thereby or unless the objection was made before the verdict."[11]  See Commonwealth v. Figueroa, 451 Mass. 566, 570 (2008) (no irregularity in empanelment of jurors is sufficient to overturn verdict unless defendant objects or demonstrates harm); Commonwealth v. Crayton, 93 Mass. App. Ct. 251, 256 (2018) (defendant objected to reduced number of peremptory challenges and asked for additional ones).  As discussed, the defendant has not shown that he was injured by the deprivation of the two peremptory challenges, and he did not object prior to the verdict.  There was no prejudice and no reason to grant a new trial on this basis.

e.  Identification evidence.  The defendant alleges that he was deprived of the right to a fair trial due to the erroneous introduction of identification testimony.  We address each of these claims in turn.

---

[11] The provision was effective until May 10, 2016, and was repealed by St. 2016, c. 36, § 1, when attorney voir dire became effective.  See St. 2016, c. 36, § 4, inserting G. L. c. 234A, §§ 67A-D.

i.  Police officer's identification of the defendant.

Surveillance video footage from the bar and from a nearby community center building played a prominent role at trial.  In his opening statement, the prosecutor characterized the video surveillance cameras "working inside and outside of [the bar] and . . . down the street at the [community center]" as "silent witnesses."  He told the jury, "You're going to be able to see what [the defendants] were wearing that night, who they arrived with, what time, what they did inside, . . . what they did outside and what they did leading up to, during and after the time that Jovany Eason and Manuel Monteiro were shot."

At trial, Boston police Sergeant Detective James Wyse testified that an individual, who was depicted in the surveillance video entering the bar at 1:04 A.M., wearing a white T-shirt, was the defendant.  The defendant objected to this testimony, and we therefore review under the prejudicial error standard.[12]  See Commonwealth v. Martinez, 431 Mass. at 173.

---

[12] For the first time on appeal, the defendant contends that Sergeant Detective Wyse impermissibly identified the codefendant and other individuals on the surveillance tapes.  We conclude that the defendant has not established a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).  Of these individuals, Brandao and Aldison Resende testified at trial and identified themselves in the surveillance video.  Other witnesses, apart from Wyse, identified all but one of the remaining individuals -- three bystanders and the codefendant.

Making a determination of the identity of a person from a photograph or video image is an expression of an opinion. Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 323-324 (2000). A lay witness is permitted to identify an individual depicted in a video or photograph if that testimony would assist the jurors in making their own independent identification. See Mass. G. Evid. § 701 (2018). "The general rule is that a witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." Commonwealth v. Vacher, 469 Mass. 425, 441 (2014), quoting Commonwealth v. Pleas, 49 Mass. App. Ct. at 326. "Put another way, such testimony is admissible . . . when the witness possesses sufficient relevant familiarity with the defendant that the jury cannot also possess" (quotations and citation omitted). Vacher, supra. Absent this foundation, a witness's identification of a defendant from a video or photograph invades the province of the jury to draw their own conclusions about who is who. Id.

We need not dwell on the issue whether Wyse was in a better position than the jurors to identify the defendant, and whether the testimony was admitted erroneously. It is clear that Wyse's identification testimony, even if erroneous, was not prejudicial. Prior to his testimony, two witnesses, Aldison

Resende and Brandao, identified the defendant as the individual depicted in the surveillance footage walking into the bar, wearing a white T-shirt. The bar owner identified the defendant as the person depicted in the surveillance footage being removed from the bar after the fight in the restroom. A fourth witness, Joao, identified the defendant, from a still image of the surveillance video, as the individual outside the bar who "took the gun from the other kid." See Commonwealth v. Austin, 421 Mass. 357, 366 (1995). Thus, although the testimony of a police officer, with its possibly greater imprint of authority as to identification of a defendant in these circumstances, is not permissible absent some compelling reason that the police officer is in a better position than the jury to identify the defendant, there was no prejudice to the defendant in these circumstances.

ii. Photographic array. The defendant also challenges the fact that, contrary to Boston police department regulations, individuals asked to identify him from a photographic array were presented only five photographs, including his, from which to choose. In November 2004, the Boston police department adopted standard protocols for the collection and preservation of eyewitness identification evidence. Under this protocol, a photographic array must "include a total of [eight] photos consisting of seven (7) fillers, plus one (1) suspect."

Pursuant to this protocol, Wyse prepared a photographic array consisting of eight photographs arranged in sequential fashion. On August 7, 2009, a police officer unconnected to the investigation, acting as a blind administrator, displayed the eight-person array to Joao. A month later, Wyse provided the folder to a different police detective unconnected with the investigation, and that detective displayed the photographs to Brandao. This time, however, three filler photographs were missing, and the array consisted of only five photographs. Wyse testified that this was a mistake, and that he had assumed that the folder was intact from the prior identification procedures and that it contained eight photographs.

The defendant did not raise this issue in a motion to suppress identification evidence as an unnecessarily suggestive identification procedure, or object to its admission in evidence at trial. See Commonwealth v. Watson, 455 Mass. 246, 250 (2009). On appeal, he contends that the use of a five-person array violated this court's ruling in Commonwealth v. Walker, 460 Mass. 590, 604 (2011), and that he has been prejudiced by the error. We review to determine whether the identification procedure created a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. at 682.

In Walker, 460 Mass. at 604, we held that, "[u]nless there are exigent or extraordinary circumstances, the police should

not show an eyewitness a photographic array, whether simultaneous or sequential, that contains fewer than five fillers for every suspect photograph."  While the procedure used inadvertently did not comport with this requirement, the defendant has not shown prejudice from it.  Walker was issued more than two years after Wyse arranged for the identification procedure used in this case.  The defendant does not contend that the identification procedure was unduly suggestive.  To the extent that the police, albeit inadvertently, violated their own internal policies, this was a matter for cross-examination.

iii.  Witness's familiarity with the defendant's name.  The defendant contends also that the judge erred in denying his request for a voir dire examination of Joao concerning his knowledge that the shooter's nickname was "Ima."  The decision to conduct a voir dire examination of a witness rests in the sound discretion of the trial judge, Commonwealth v. Rodriguez, 425 Mass. 361, 370 n.5 (1997), and the judge's ruling will not be disturbed unless it constitutes "a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (quotations and citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Prior to August 1, 2009, Joao recognized the defendant from the neighborhood and knew the street where the defendant lived,

but did not know his name or nickname. Sometime after the shooting, and before Joao spoke to the police, he learned from someone in the community that the shooter's nickname was "Ima." On August 7, 2009, Joao identified the defendant's photograph from an array and described him as "Ima." He told the police that the person in the photograph was "the person [he saw] shoot inside [the bar]. I [saw] him [take] a gun from the other guy and shoot. 'Ima Ima.'"

The defendant requested a voir dire examination of Joao to determine "where [Joao] got that information." The prosecutor represented that Joao had heard the nickname from an unknown source outside of law enforcement, had known the shooter "by face" prior to the incident, and knew where the shooter lived. The judge denied the request for a voir dire hearing, and ruled that the Commonwealth would be prohibited from suggesting that Joao had known the defendant's nickname before the shooting. The judge agreed with the Commonwealth that Joao's lack of personal knowledge at the time of the shooting would be "fair cross-examination."

On direct examination, Joao testified that he had seen the shooter around "once in a while" on a particular street in the neighborhood, and that he knew that the defendant's father, "Mocho," lived on that street. Joao further testified:

Q.:  "Is it fair to say that the person you saw shooting the gun, you didn't know that person by name?"

A.:  "Before, no."

Q.:  "And you didn't know that person by nickname?"

A.:  "No."

Q.:  "But you did know, and you told the police, you knew that person by sight?"

A.:  "Yes."

Later, Joao testified that he identified "Ima" from a series of photographs.  He stated, however, that he did not know the shooter's nickname on August 1, 2009, and only heard the nickname from someone else.

We discern no abuse of discretion in the judge's decision to deny the defendant's motion for a voir dire hearing concerning the source of Joao's information.  Joao testified that someone told him the defendant's nickname prior to the identification procedure, and there was no suggestion that Joao knew the nickname at the time of the shooting.  The defendant chose not to pursue the issue on cross-examination, and did not contend that this information tainted Joao's identification testimony.

f.  Ineffective assistance of counsel.  The defendant moved for a new trial, pursuant to Mass. R. Crim. P. 30, as appearing in 435 Mass. 1501 (2001), based on trial counsel's "inexplicable" failure to investigate and advance a defense of

intoxication. Another judge (the trial judge having retired) denied the defendant's motion for a new trial without a hearing. The motion judge determined that the defendant had not raised a substantial issue that would merit a hearing. In the motion judge's view, trial counsel made a reasoned, strategic decision to forgo an intoxication defense based on the available evidence. When the defendant submitted his motion for a new trial, evidence that he had been drinking alcohol and smoking marijuana throughout the day of the shooting was not newly discovered, as it would have been readily discoverable through reasonable diligence prior to trial, and, indeed, the defendant's counsel had mentioned at the beginning of trial that he intended to call the defendant's sister as to her knowledge of the defendant's drinking and smoking throughout that day.

In reviewing a claim of ineffective assistance in a case of murder in the first degree, we apply the more favorable standard of review of a substantial likelihood of a miscarriage of justice, pursuant to G. L. c. 278, § 33E. See Commonwealth v. Vargas, 475 Mass. 338, 358 (2016). "We consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." Id., quoting Commonwealth v. Lessieur, 472 Mass. 317, 327, cert. denied, 136 S. Ct. 418 (2015). Where the ineffective assistance

of counsel claim is based on a tactical or strategic decision, we apply a more rigorous standard that, to be ineffective, the attorney's decision must have been "manifestly unreasonable" (citation omitted). See Commonwealth v. Lang, 473 Mass. 1, 14 (2015). Based upon our review of the record, we agree with the motion judge's conclusion that the defendant was not deprived of his right to effective representation.

To support his motion for a new trial, the defendant submitted five affidavits from friends and family members (his sister and brother) stating that they knew from personal observation that the defendant had been intoxicated from drinking alcohol and smoking marijuana on August 1, 2009. The defendant's proffer included an affidavit from his sister, who stated, "I was at my residence with my brother Emmanuel Pina and several other friends and family. We were hanging out on the porch from the early morning into the late evening. We were drinking beer and smoking weed. I observed my brother . . . to be drinking and smoking all day with us and appeared to be high and intoxicated."

The defendant also submitted an affidavit of trial counsel detailing counsel's efforts to investigate and raise an intoxication defense. In sum, trial counsel located witnesses, including the defendant's sister, who "confirmed that [the defendant] had been drinking beer/hard liquor and smoking

marijuana just before he left for the bar." Trial counsel interviewed the defendant's sister and "became concerned about her memory, willingness to testify and her ability to withstand cross-examination." In addition, trial counsel's investigator continued to search for other witnesses to corroborate the sister's testimony. The investigator identified at least one individual who indicated that the defendant had been intoxicated that night. That person subsequently refused to meet with trial counsel. Other potential witnesses, according to trial counsel, "down right refused to speak with [the investigator and trial counsel]."

During the trial, counsel continued to assess the value of presenting an intoxication defense through the defendant's sister, in light of her vulnerabilities and the possibility that the defendant would testify. On the first day of empanelment, trial counsel moved to exempt the defendant's sister from the sequestration order. He informed the judge that she would testify "as to [one] narrow area and that is that she was with my client the evening of the shooting . . . they were drinking shots and beer on the porch of their house. . . . Her opinion would be that [the defendant] had drunk excessively that night."

As the trial unfolded, counsel waited until the close of the Commonwealth's evidence before he decided whether to call the sister as a witness. In his affidavit, trial counsel

explained that he "assessed this possibility in conjunction with [the defendant] testifying himself." When the Commonwealth rested, trial counsel decided not to call the sister or to present any evidence. While he did not recall the details of his discussions with the defendant's sister, counsel represented that "this conversation reinforced my concerns that she would not be a good witness."

A judge is required to grant a defendant an evidentiary hearing on a motion for a new trial "only if a substantial issue is raised by the motion or affidavits." Commonwealth v. Torres, 469 Mass. 398, 402 (2014). See Mass. R. Crim. P. 30 (c) (3). "[A] judge considers the seriousness of the issues raised and the adequacy of the defendant's showing on those issues." Torres, supra at 402-403. See Commonwealth v. Shuman, 445 Mass. 268, 278 (2005).

The judge had more than adequate grounds on which to deny the motion for a new trial without an evidentiary hearing. She found that trial counsel's affidavit was "very clear about the decision he made on the question of intoxication." Trial counsel, she determined, "spotted the possible defense early and took reasonable and diligent steps to pursue it." These steps included attempting to identify additional witnesses and assessing the value of calling the defendant's sister in light of her "difficulties." The judge determined that trial counsel

"made the deliberate and strategic decision that [the sister] would not be a good witness." The judge concluded, and we agree, that counsel's informed strategic decisions were not manifestly unreasonable.

Moreover, the defendant has not demonstrated that he raised a substantial issue of newly discovered evidence. A defendant seeking a new trial on the ground of newly discovered evidence bears the burden of demonstrating that (1) the evidence "is in fact newly discovered"; (2) the newly discovered evidence is "credible and material"; and (3) the newly discovered evidence "casts real doubt on the justice of the conviction" (quotation and citation omitted). See Commonwealth v. Staines, 441 Mass. 521, 530 (2004). The first prong of this test requires a defendant to show that reasonable diligence, on the part either of the defendant or defense counsel, would not have uncovered the evidence by the time of trial, or, if a subsequent motion for a new trial, the earlier filing of the first motion for a new trial. See Commonwealth v. Grace, 397 Mass. 303, 306 (1986). See also Commonwealth v. LaFaille, 430 Mass. 44, 55 (1999) (defendant could be expected to uncover evidence that witness observed someone else shoot victim where witness dated defendant's sister at time of trial).

The defendant has not met his burden of demonstrating that reasonable pretrial diligence on his part would not have

produced the statements by the purportedly newly discovered witnesses.  The witnesses consisted of the defendant's friends, and a family member, who were with him for hours prior to the incident.  Further, according to the trial record, two of the friends were inside the bar with the defendant and participated in the altercation.  We agree with the motion judge that "the identity of all these people was readily discoverable by the defendant long before trial.  All that can fairly be described as new about these affidavits is the witness's new willingness to address the particular topic of [the defendant's] intoxication, and to go on record doing so."  A posttrial change of heart by a witness, well known to the defendant before trial, does not constitute newly discovered evidence.

3.  <u>Review under G. L. c. 278, § 33E</u>.  We have carefully reviewed the entire record pursuant to G. L. c. 278, § 33E, and we conclude that there is no reason to order a new trial or to reduce the conviction to a lesser degree of guilt.

<u>Judgements affirmed</u>.