NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11423


COMMONWEALTH  vs.  JESUS GARCIA.



Hampden.     February 27, 2019. - June 7, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, & Kafker, JJ.


Homicide.  Constitutional Law, Sentence, Public trial.
     Practice, Criminal, Instructions to jury, Sentence, Public
     trial, Capital case.




     Indictments found and returned in the Superior Court
Department on August 13, 2010.

     The cases were tried before Mary-Lou Rup, J., and a motion
for a new trial was heard by her.


     Alan Jay Black for the defendant.
     Katherine E. McMahon, Assistant District Attorney, for the
Commonwealth.
     Ryan M. Schiff & David Rossman, for Omar Abdur-Rahim &
others, amici curiae, submitted a brief.


     LOWY, J.  A jury convicted the defendant of murder in the

first degree on theories of deliberate premeditation and extreme

atrocity or cruelty.[1]  The judge sentenced the defendant to life imprisonment without the possibility of parole on the murder conviction.[2]  On appeal, the defendant argues that (1) the judge erred in declining to instruct the jury on voluntary manslaughter; (2) the defendant's age at the time of his crimes -- nineteen years old -- renders his sentence unconstitutional; and (3) the judge should have granted a new trial due to a partial court room closure.  The defendant also requests that we exercise our power under G. L. c. 278, § 33E, to either reduce his convictions or grant a new trial.  Because we find neither reversible error nor a reason to exercise our authority under § 33E, we affirm.[3]

Background.  We recite certain facts the jury could have found, reserving other details for later discussion.  In July 2010, the fifteen year old daughter of the murder victim (victim

---

[1] The defendant also was convicted of armed assault with intent to murder; two counts of burglary assault on an occupant, one of which the judge set aside as legally inconsistent with other verdicts; breaking and entering in the nighttime with intent to commit a misdemeanor; two counts of assault and battery by means of a dangerous weapon; assault and battery; and assault with intent to rape.  He was found not guilty of attempt to commit rape.

[2] The judge also sentenced the defendant to from seven to eight years' imprisonment from and after the life sentence to account for crimes committed against individuals other than the murder victim.

[3] We acknowledge the amicus brief submitted by Omar Abdur-Rahim, Gary Johnson, and Lonnie Watkins.

or mother) was dating the defendant, who was nineteen. The daughter lived in Hampden with her sister, her stepfather, and her mother. The daughter awoke in her bedroom on July 21 to a gloved hand over her mouth. There was a knife against her throat and a masked face staring at her. The daughter knew from the assailant's voice and clothing that he was the defendant, and she later recognized him when he took off his mask. The defendant tried to pull the daughter's shorts off multiple times but never entirely removed them. He eventually put the knife down and explained to the daughter, "I was trying to see what you would do in that situation. . . . I was trying to show you the world wasn't safe."

The daughter then told her mother the defendant was in her room. They went into the room and found the defendant hiding in a closet. After the victim told the defendant to "[g]et out," the defendant left.

Following the July 21 incident, the victim became scared that the defendant would return to the house. She started locking the doors at night. The victim also told her daughter that the victim would not let anything bad happen to her, and that if the defendant came back he would have to get through the victim.

At night on July 29, the daughter sent a text message to the defendant stating that their relationship was over. In the

morning on July 30, the family dog started barking in the victim's house. The stepfather investigated and noticed the cellar door was open. He closed it, and then went into the kitchen to find the victim running toward him. The victim said the defendant was in the daughter's room. According to the stepfather's testimony, "Before she finished saying it, [the defendant] came storming out towards us" with a knife. The defendant sliced the stepfather's throat and cut him above the eye. The stepfather went to the door leading outside but could not open it, so he turned around and saw the defendant "standing over" the victim with the knife. Although the victim was hidden behind a counter, the stepfather heard the victim making sounds similar to "somebody getting punched." As the stepfather escaped outside through the door, the defendant stabbed him in the back multiple times.

The victim's daughter left her bedroom when she heard her stepfather's screams. She saw the defendant stabbing her mother. When the daughter tried to escape, the defendant dragged her into the kitchen by her hair. The daughter saw the defendant slice her mother's throat, and then she escaped outside.

At trial, defense counsel admitted in the opening statement that the defendant killed the victim, and then stated that the evidence would show the defendant was guilty of manslaughter

rather than murder. After the judge declined to instruct the jury on manslaughter, defense counsel argued in closing that the defendant was not guilty of murder because he did not act with malice, but rather in response to the victim confronting him with a knife. The defendant presented one witness: an expert who testified about, among other things, brain development of teenagers.

A jury convicted the defendant of various crimes, including murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. The judge sentenced the defendant to life in prison without the possibility of parole on the murder conviction.[4] The defendant appealed, and then moved for a new trial due to an asserted partial court room closure. The judge denied the motion after an evidentiary hearing. We have consolidated the defendant's direct appeal with his appeal from the denial of his motion for a new trial.

Discussion. 1. Voluntary manslaughter instruction. We discern no error in the judge's decision not to instruct on voluntary manslaughter. See Commonwealth v. Gulla, 476 Mass. 743, 748 (2017). "A manslaughter instruction is required if the evidence, considered in the light most favorable to a defendant,

_____

[4] After the defendant was convicted, he moved for a sentence of life with the possibility of parole. The motion was denied.

would permit a verdict of manslaughter and not murder." Commonwealth v. Pina, 481 Mass. 413, 422 (2019). "Voluntary manslaughter is an unlawful killing 'arising not from malice, but "from . . . sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense"'" (citation omitted). Commonwealth v. Acevedo, 446 Mass. 435, 443 (2006).

The defendant argues on appeal, as he did at trial, that the jury could have found that the victim armed herself with a knife on July 30 to protect her daughter, confronted the defendant, and then lost the knife to the defendant, who killed her with it.[5] There was no direct evidence at trial of such a confrontation. The defendant acknowledges as much and points instead to circumstantial evidence. Viewed in the light most favorable to the defendant, that evidence is as follows: (1) after the defendant attacked the victim's daughter on July 21, the victim told her daughter that the defendant would have to

---

[5] On appeal, the defendant also suggests that he was provoked by the victim's daughter breaking up with him. However, the "provocation must come from the victim." Commonwealth v. Hinds, 457 Mass. 83, 90 (2010), quoting Commonwealth v. Ruiz, 442 Mass. 826, 838-839 (2004). And "[m]ere words generally do not constitute sufficient provocation to warrant an instruction on [manslaughter]." Commonwealth v. Tu Trinh, 458 Mass. 776, 783 (2011), quoting Commonwealth v. Vick, 454 Mass. 418, 429 (2009). Cf. Commonwealth v. Zagrodny, 443 Mass. 93, 106 (2004) ("victim's 'leaving' her husband and 'taking' their children is not evidence of provocation sufficient to warrant a voluntary manslaughter instruction").

get through her if he ever came back; (2) when the victim and her family peacefully confronted the defendant on July 21, the defendant left peacefully; (3) the murder weapon came from the victim's house; (4) the victim held the murder weapon at some point, as shown by her deoxyribonucleic acid on its handle; and (5) the defendant had fresh cuts and scratches on his body when he was interviewed by police on July 30.

The defendant's theory of events "is entirely speculative." Pina, 481 Mass. at 424. The evidence provides no detail about the victim's supposed attack against the defendant, and "a judge should not instruct the jury 'on a hypothesis not supported by the evidence.'" Id. at 422, quoting Commonwealth v. Vanderpool, 367 Mass. 743, 746 (1975). Thus, a voluntary manslaughter instruction was not warranted. See Commonwealth v. Rodriquez, 461 Mass. 100, 108 (2011), quoting Commonwealth v. Espada, 450 Mass. 687, 696-697 (2008) ("Generally, for sudden combat to be the basis of a voluntary manslaughter instruction, the 'victim . . . must attack the defendant or at least strike a blow against the defendant'"). See also Commonwealth v. Brum, 441 Mass. 199, 206 n.12 (2004) ("Even if a victim brandishes a weapon or attacks a defendant, it does not necessarily create sudden combat or reasonable provocation"). Cf. Gulla, 476 Mass. at 748 (evidence did not support voluntary manslaughter instruction where defendant had "injury to the back of his head"

and "defendant told first responders that the victim bit him," but there was "no evidence that [the victim] initiated physical contact").

2. <u>Constitutionality of sentence</u>. The defendant argues, as he did at trial, that mandatory sentences of life in prison without the possibility of parole are unconstitutional as applied to defendants who committed murder in the first degree when they were teenagers or in their early twenties. See G. L. c. 265, § 2. Because the defendant was nineteen years old at the time of his crimes, he contends that his sentence violates the prohibition on "cruel and unusual punishments" under the Eighth and Fourteenth Amendments to the United States Constitution and the prohibition on "cruel or unusual punishments" under art. 26 of the Massachusetts Declaration of Rights. On this record, we decline to hold the defendant's sentence unconstitutional.

In <u>Miller</u> v. <u>Alabama</u>, 567 U.S. 460, 465, 470 (2012), the United States Supreme Court held that mandatory sentences of life without parole violate the Eighth Amendment when imposed on those who are under the age of eighteen when they commit homicide. In <u>Diatchenko</u> v. <u>District Attorney for the Suffolk Dist.</u>, 466 Mass. 655, 673 (2013), <u>S.C.</u>, 471 Mass. 12 (2015), we decided that sentences of life without parole, whether mandatory or discretionary, violate art. 26 where imposed on individuals

who are under the age of eighteen when they commit murder in the first degree.  See Commonwealth v. Lugo, 482 Mass. 94, 98-101 (2019) (describing Miller and Diatchenko).  The rulings in Miller and Diatchenko do not apply to the defendant here, who committed his crimes at the age of nineteen.

We recognize that "[s]cientific and social science research on adolescent brain development . . . continues."  Commonwealth v. Okoro, 471 Mass. 51, 59-60 (2015).  "For example, researchers continue to study the age range at which most individuals reach adult neurobiological maturity, with evidence that although some brain systems have fully matured in most individuals by around age fifteen, other brain functions are not likely to be fully matured until around age twenty-two."  Id. at 60 n.14.  Indeed, the defendant's expert testified that certain parts of the brain, the frontal lobes, take over twenty years to "finish developing."  According to the expert, these portions of the brain regulate important functions such as "controlling impulses, . . . inhibition of unwanted behaviors, [and] decision-making."

Although this testimony and similar research may relate to the constitutionality of sentences of life without parole for individuals other than juveniles,[6] "we appear to deal here with a

---

[6] The term "juvenile" refers in this opinion to someone under the age of eighteen at the time of his or her crimes.

rapidly changing field of study and knowledge." Id. at 60. The minimal record on brain development in this case, consisting of one expert's testimony presented during trial rather than at sentencing, does not allow us to reach an informed conclusion on whether individuals in their late teens or early twenties should be given the same constitutional protections as juveniles for purposes of the Eighth Amendment and art. 26. We decline on this record to extend beyond juveniles the decisions in Miller and Diatchenko. Cf. Commonwealth v. Chukwuezi, 475 Mass. 597, 610 (2016) (upholding constitutionality of mandatory sentence of life without parole for defendant who was eighteen years old at time of crime).

3. Court room closure. The judge found the following facts after an evidentiary hearing on the defendant's motion for a new trial. We accept the facts as they are not clearly erroneous. See Commonwealth v. Rakes, 478 Mass. 22, 36 (2017).

An investigator with the Committee for Public Counsel Services (CPCS) was standing inside the court room during closing arguments because he did not see any seats available. A court officer "approached [the investigator] and told him he could not stand there as the back doors of the courtroom needed to remain clear. . . . [H]e told [the investigator] to take a seat or [the court officer] would find a seat for him." The

investigator then left the court room after telling the court officer "he would wait outside."[7]

While outside, the investigator told or suggested to two people, a relative of the victim and a CPCS attorney, that they could not enter the court room because standing was not allowed. After speaking with the investigator, the relative entered the court room, found a seat, and watched the proceedings for a time before leaving. The CPCS attorney looked in the court room, saw that it was crowded, and left. No court officer excluded either individual from the court room.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee defendants "the right to a . . . public trial." Rather than risk violating this right by telling a spectator to leave, the court officer here offered to find the investigator a seat. It is irrelevant that the investigator then told or suggested to other spectators that they could not

---

[7] The investigator with the Committee for Public Counsel Services testified that the court officer told him he needed to wait outside the court room because there were no seats available. The judge discredited this testimony, finding that the court officer "did not tell [the investigator] that he had to leave and remain outside the courtroom, but only that he could not stand blocking the public exit doors." Although the defendant argues the judge should have believed the investigator, "[t]he judge was not required to credit the [investigator's] testimony," Commonwealth v. Rakes, 478 Mass. 22, 36 (2017), and we accord special deference to the judge's findings "where, as here, the motion judge was also the trial judge." Id.

enter the court room. For there to be closure in the constitutional sense, "[s]ome affirmative act by the court or one acting on its behalf is required." Commonwealth v. Rogers, 459 Mass. 249, 263, cert. denied, 565 U.S. 1080 (2011). There was no official act of exclusion here.

The defendant argues that attorneys should have been asked to move in front of the attorneys' bar to make room in the public seating area for nonattorney spectators. The judge found that the district attorney for the Hampden district and an assistant district attorney entered around the time of closing arguments and sat in chairs in front of the attorneys' bar. But the investigator never gave the court officer an opportunity to rearrange the seating, deciding instead to wait outside. And the court was not obliged preemptively to seat in front of the attorneys' bar lawyers uninvolved in the case.

The defendant argues also that the court officer should have brought to the judge's attention the investigator's inability to find a seat. However, the judge did not need to address the issue because the court officer offered to find the investigator somewhere to sit, meaning there was no risk that a spectator would be excluded. Cf. Commonwealth v. Fernandes, 478 Mass. 725, 732-733 (2018), quoting Commonwealth v. Cohen (No. 1), 456 Mass. 94, 115 (2010) (among other requirements, "judge must make 'findings adequate to support the closure'"

where there is partial closure, although "reviewing court may examine the record itself to see if it contains sufficient support for the closure . . . in the absence of formal or express findings by the judge").  There was no error in denying the defendant's motion for a new trial.[8]

4.  Review under G. L. c. 278, § 33E.  After reviewing the entire record pursuant to our obligation under § 33E, we decline to reduce the murder verdict to a lesser degree of guilt or to order a new trial.

Judgments affirmed.

---

[8] The defendant did not raise at trial the issue of court room closure, as it appears defense counsel did not learn of the asserted closure until after sentencing.  Therefore, the defendant's claim is procedurally waived and any error, instead of resulting in automatic reversal, is reviewed for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Robinson, 480 Mass. 146, 149-150, 153, 154-155 (2018).  Even if there were error, it would not warrant reversal under that standard.